R. J. DAUM CONST. CO. v. CHILD et al.

No. 7790.   Decided September 4, 1952.   (247 P. 2d 817.)

See 17 C. J. S., Contracts, sec. 43. Offerer's acceptance of conditions imposed in offeree's qualified acceptance. 12 Am. Jur., Contracts, secs. 53 et seq.; 135 A. L. R. 821.

*Critchlow, Watson & Warnock, George A. Critchlow, Alonzo W. Watson, Alonzo W. Watson, Jr., Ned Warnock,* Salt Lake City, *Edward L. Conroy,* Los Angeles, Cal., for appellant.

*Benjamin L. Rich, Gordon R. Strong,* Salt Lake City, for respondent.

WADE, Justice.

Was there evidence from which it could reasonably be found that there was a meeting of the minds, thence a binding contract, is the question which this appeal presents. The trial court held as a matter of law that appellant did not accept respondents' bid and dismissed appellant's action. Plaintiff R. J. Daum Construction Company appeals. The dismissal was ordered at the pre-trial conference, after the parties had stipulated all of the evidence bearing on that question and each side had moved for a judgment in its favor on that question, appellant moved for a holding as a matter of law that there was a meeting of the minds and therefore a contract, and that only the amount of damages be submitted to a jury, and respondents moved for a dismissal of the action on the ground that as a matter of law the evidence showed no meeting of the minds. Though this motion was not expressly so designated, it was really a motion for a summary judgment under Rule 56(c), Rules of Civil Procedure so unless "there is no genuine issue as to any material fact" and respondent "is entitled to a judgment as a matter of law" the decision must be reversed. If there was evidence from

which it would be reasonable to find that there was a meeting of the minds, the decision cannot be sustained.

Prior to June 20, 1950, Richard C. Riding, appellant's superintendent of construction for this area, asked Thomas B. Child, one of the partners of respondent Thomas B. Child & Company, to submit a bid on the masonry work of a government construction job at the Ogden General Depot, on which appellant intended to submit a bid as general contractor. Riding furnished Child with the plans and specifications except addendum No. 1, and later Child phoned to Riding's home his bid for $91,392. This was the lowest bid which appellant received for that work and it was used in figuring appellant's bid on the entire job at $190,392. The Government opened the bids on June 22, 1950, and found that appellant had submitted the lowest bid on the entire job. Within a few days Child was notified of these facts and given to understand that when and if the contract was awarded to appellant, a sub-contract for the masonry work would probably be submitted to respondents, and he was asked to furnish a written verification of his bid which he furnished by a letter dated June 23, 1950. By a contract dated June 29, 1950, appellant was awarded this job; thereafter appellant mailed from its California office a proposed sub-contract which was dated July 11, 1950, for the masonry work. This proposed contract was signed by the vice-president of that company and respondents were requested to sign and return one copy thereof. Thereafter, Child objected to some of the terms of the proposed written contract and unqualifiedly refused to do this masonry work. Appellant sued for $79,500 damages.

Appellant claims (1) that the evidence would reasonably sustain a finding that appellant unconditionally accepted respondents' bid, and (2) that respondents are by their actions estopped from denying that there was a contract.

Appellant's contention (1) presents two problems: (a) Was there an oral acceptance? and (b) Was the proposed written contract an acceptance or was it a rejection and

counter-offer? We consider these questions in the order stated.

All of the negotiations between these parties were between Thomas B. Child and Richard C. Riding, except that appellant's California office drew up, executed and sent to Child the proposed written contract. The deposition of each of these persons was taken and is a part of this record. The evidence of an oral acceptance is substantially as follows: Appellant received only two bids on this brick work before submitting its bid to the Government. One was for $151,743; since respondents' bid was much lower, it was used by appellant in figuring its bid to the Government. On the same day and immediately after the Government had opened the bids, appellant received a third bid on the brick work for $105,000, and after respondents had refused to do this work, appellant sought and obtained a fourth bid for this work of $95,000, which it accepted. Shortly after the Government opened the bids, Child and Riding talked together over the telephone, in which conversation Child was informed that appellant was the low bidder and that respondents' bid for the brick work was the lowest bid and had been used by appellant in figuring its bid to the Government, and Child was asked to furnish a written confirmation of their bid which he did by a letter dated June 23, 1950, only one day after the bids were opened. To this confirmation a postscript was attached in the handwriting of Child, which read: "Add for each fire door if filled $175.00." Riding testified that this postscript covered part of the specifications of addendum No. 1, that he could not remember having talked with Child about this, that he had not shown Child a copy of that addendum, but felt that it was clear that he must have talked with Child about that addendum for otherwise Child would not have written that postscript.

Riding further testified that sometime after the above conversation, he called Child on the telephone and asked him how he wanted to handle the reinforcing steel, whether

respondents would place it or appellant should do that through another subcontractor, and that Child told him that he would rather place it provided it was all bent, cut and designed properly. He further testified that at the time of this conversation appellant did not have any contract with the Government, had not given Child any contract or accepted his proposal, that up to that time it was all just preliminary negotiations, and that prior to mailing to respondents the proposed written contract appellant's office had not confirmed or accepted respondents' bid.

There is no material conflict between the testimony of Riding and Child. Child's version was that there was only one telephone conversation between him and Riding after the bids were opened until about July 14, after he had received the proposed contract from the California office, and that in that conversation all the matters detailed above were discussed, and his testimony does not materially disagree with Riding's testimony as to what was said about such matters. He testified that Riding told him that they were the low bidder, that they expected to get the job, that "it takes the Government quite a while to decide what they want, but after we have got fixed up for it we will give you a form of contract".

Appellant relies on one other thing as showing that Child understood that his bid had been accepted. Riding testified that after Child had refused to have any more to do with that job he agreed to turn over to appellant an order for brick for that job which he had placed with a brick company. But on further questioning he admitted that he did not know whether Child said he had ordered such brick or not. Child positively denied that he had ordered any brick for that job but said that he had told the brick company that he expected to get that job and inquired about the price; he testified that he had agreed to use his influence with the brick company so that appellant could get the brick.

If appellant unconditionally accepted respondents' offer before it was withdrawn, there was a binding contract.

Such an acceptance requires manifestation of unconditional agreement to all of the terms of the offer and an intention to be bound thereby. Such manifestation may be either written or oral or by actions and conduct or a combination thereof, but regardless of the form or means used, there must be made manifest a definite intention to accept the offer and every part thereof and be presently bound thereby without material reservations or conditions. See *Thornton* v. *Pasch,* 104 Utah 313, 139 P. 2d 1002; Restatement of the Law of Contracts, Vol. 1, Ch. 3, Secs. 21, 25 and 26; 17 C. J. S., Contracts, §§ 33, 41a, and 49, pages 362, 373, 394; 1 Williston on Contracts, Revised Ed. 43 to 67, Secs. 22a to 29. On this, the Restatement Sec. 26 says:

"Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions as stated in § 25.

"Comment a. Parties who plan to make a final written instrument as the expression of their contract, necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then fulfilled all the requisites for the formation of a contract. On the other hand, if the preliminary agreement is incomplete, it being apparent that the determination of certain details is deferred until the writing is made out; or if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract."

An acceptance must be clear, positive and unambiguous. See Williston on Contracts, Revised Ed., pp. 207 to 209, Sec. 72, where it is said:

"An acceptance must be positive and unambiguous. This requirement is often treated as identical with the requirement dealt with

in the following sections that an acceptance must not change, add to, or qualify the terms of the offer; and such changes or qualifications undoubtedly prevent an acceptance from being positive and unequivocal. But even though no change in the offer is suggested in the reply of the offeree, it nevertheless may not so clearly indicate assent to the offer as to create a contract * * *. But if there has been unequivocal acceptance, the contract is complete and its binding force cannot be affected by subsequent communications unless they amount to a mutual agreement to rescind."

It is clear that no binding contract was intended unless and until the Government awarded to appellant the general contract. But this does not prevent a binding contract from coming into effect upon the happening of that event if such was the manifested intention of the parties. *Frederick Raff Co.* v. *Murphy,* 110 Conn. 234, 147 A. 709. There is no claim that the offer was withdrawn before appellant was awarded the general contract so we do not have to consider whether the offer could have been withdrawn after it had been accepted conditioned only on appellant being awarded the general contract.

There is no claim that appellant expressly accepted respondents' offer either orally or in writing prior to appellant's proposed written contract. Child testified that he was told that if appellant was awarded the Government contract he would probably be furnished a form of contract. Riding testified positively that the last negotiations before the proposed written contract was received by Child were only preliminary, and no contract had been agreed upon. This evidence not only shows that there was no express acceptance but both parties considered that there had been no implied acceptance.

With this evidence in mind conversations and surrounding facts and circumstances do not show an acceptance. Neither the fact that appellant used respondents' bid in figuring its bid to the Government, that appellant's bid to the Government was the low bid and it was finally awarded the Government contract, the com-

munication of such facts to respondents, the request for and the furnishing of a written confirmation of respondents' bid, nor the conversation in regard to placing of the reinforcements, nor all these circumstances together definitely manifested an intention to accept respondents' bid and be presently bound thereby. Each and all of these circumstances are as consistent with an intention and expectation only to negotiate a contract in the future as they are with a present intention to accept and enter into a binding conract. Since the plaintiff has the burden of showing that an acceptance was more probable than not, we hold as a matter of law that it would be unreasonable to find from this evidence that an acceptance had been manifest prior to sending the proposed written contract from appellant's California office to the respondents. *James Baird Co.* v. *Gimbel Bros.*, 2 Cir., 64 F. 2d 344.

This result is not changed even though we accept Riding's testimony as true that Child said he had ordered the brick for this job. We are here concernd with manifestations by appellant of an intention to unconditionally accept respondents' offer; this evidence does not tend to show any such manifestation on the part of the appellant but merely at most indicates the construction placed thereon by Mr. Child. Of course, if Mr. Child had stated that he considered that appellant had unconditionally accepted his offer, that would have some weight in determining the proper construction which should be placed on appellant's conduct. But this evidence, even though construed most favorably to appellant when considered with the other evidence, fails to show a manifestation of an intention to accept respondents' bid.

Appellant's proposed written contract was not an unconditional acceptance of respondent's offer, but was a rejection and counter-offer. To create a binding contract the acceptance must unconditionally agree to all the material provisions of the offer, and must not add any new material conditions, but all of the provi-

sions of an offer need not be expressly stated therein—some may be implied from the surrounding circumstances. See Williston on Contracts, pp. 209, 222 to 225 and 227 to 229, Secs. 73, 77 and 78, and Restatement of the Law of Contracts, pp. 65 to 67, Secs. 58, 59 and 60.

Sec. 58 provides:

"Acceptance must be unequivocal in order to create a contract."

Sec. 59 provides:

"Except as this rule is qualified by §§ 45, 63, 72, an acceptance must comply exactly with the requirements of the offer, omitting nothing from the promise or performance requested."

Sec. 60 provides:

"A reply to an offer, though purporting to accept it, which adds qualifications or requires performance of conditions, is not an acceptance but is a counter-offer.

"Comment a. A qualified or conditional acceptance is a counter-offer, since such an acceptance is a statement of an exchange that the person making it is willing to make, differing from that proposed by the original offeror. A counter-offer is a rejection of the original offer (see § 38 and Comment thereon). An acceptance, however, is not inoperative as such merely because it is expressly conditional, if the requirement of the condition would be implied from the offer, though not expressed therein."

Willison on Contracts, supra, Sec. 73, says:

"In order to make a bargain it is necessary that the acceptor shall give in return for the offeror's promise exactly the consideration which the offeror requests. If an act is requested, that very act and no other must be given. If a promise is requested, that promise must be made absolutely and unqualifiedly. This does not mean necessarily that the precise words of the requested promise must be repeated, but by a positive and unqualified assent to the proposal the acceptor must in effect agree to make precisely the promise requested; and if any provision is added to which the offeror did not assent, the consequence is not merely that this provision is not binding and that no contract is formed, but that the offer is rejected."

Sec. 77 of that work says:

"A conditional acceptance is in effect a statement that the offeree is willing to enter into a bargain differing in some respect from that proposed in the original offer. The conditional acceptance is, therefore, itself a counter-offer and rejects the original offer, so that thereafter even an unqualified acceptance of that offer will not form a contract."

Sec. 78 of that work says:

"Sometimes an acceptor from abundance of caution inserts a condition in his acceptance which merely expresses what would be implied in fact or in law from the offer. As such a condition involves no qualification of the acceptor's assent to the terms of the offer, a contract is not precluded."

We hold that appellant's proposed written contract was a counter-offer and not an unconditional acceptance of respondents' bid.

The bid was for $91,392.00 exclusive of the requirements of addendum No. 1. All the evidence is that Child did not see that addendum before he received the proposed written contract, and that the postscript requiring an additional $175.00 for each fire door if filled was an additional cost for part of the additional specifications required by that addendum. Yet the proposed written contract expressly includes addendum No. 1, without providing the added compensation provided therefor in the bid. These provisions were on a material matter directly contrary to the bid, and constituted a counter-offer and not an acceptance of the bid. This is not remedied by the fact that the additional requirements of addendum No. 1 were not insisted on by the Government when the job was actually done for the proposed contract did make those additional requirements, and respondents had they executed it would have been bound to do the additional work without the extra compensation provided in their bid. They could not then know that the Government would waive performance of

those specifications. So this bid was a counter-offer and not an acceptance of respondents' bid.

Appellant's proposed written contract is a printed form with blank spaces for names, dates and other matters typed in. One of such blanks contains the following:

"Time is the essence of this contract. General contract to be completed within 120 calendar days. $50.00 per day penalty thereafter —sub-contractor to complete his work as scheduled."

Riding testified that on the evening of July 14, 1950, he called Child by telephone and arranged to take him to Ogden to meet the other sub-contractors and go over the work. Although Child had the proposed contract at that time, Riding claims he made no mention of it in that conversation but that the next morning Child showed him the proposed written contract and objected to the above quoted provisions, and that also complained that they were losing men on account of the Korean war and said that he and his brothers had met and decided to not go through with the contract. Riding said that he offered to strike out the $50 per day penalty provision and initial it then and there. He further said that no schedule had been made but would have to be arranged in the future between him and the sub-contractors. Child agreed that Riding had called him on the evening of July 14, about going to Ogden the next day, but said he told him in that conversation that he had the proposed contract, objected to the above quoted provisions and told him that he and his brothers had decided to not sign up the job because the proposed contract did not conform with their propsals. He denied that Riding offered to strike out the penalty provision of the contract. In the later contract which appellant entered into with another contractor for this brick work, Riding wrote after the $50 per day penalty provision, "This is not called for in Government specs." and initialed it "R. C. R."

Appellant argues that the above quoted provision merely recites the provisions of the general contract which were

known to respondents that the general contract must be completed within 120 days with a $50 per day penalty thereafter against the general contractor, but did not purport to provide for such a penalty against respondents, and it was implicit in the bid that time was the essence of the contract, and that the sub-contractors should complete their job within a reasonable schedule to be worked out so that the entire job could be completed within the 120-day limit.

This argument would have more force were it not for other related provisions of the proposed contract. Subdivision "Second" thereof provides that:

"The Sub-contractor shall not be held responsible for any delays or interruptions caused by the neglect, delay or default of the Contractor, the Owner, the Architect or any other Sub-contractor, and the Sub-contractor hereby waives any and all claims upon the Contractor for damages for any act, omission or delay caused by the Contractor, the Owner, the Architect or any other Sub-contractor, and hereby undertakes the work subject to all conditions as they now exist or may arise."

The first part of the quoted sentence is fair to all parties and would be implicit in the bid, but the waiver provision which follows is highly unfair to respondents' interest; particularly is this true since respondents' work would have to be sandwiched in between the work of many others. It does not seem improbable that respondents might suffer damages which it could not collect on account of this waiver provision, and still as will be later pointed out, respondents are held to strict liability for all damages which they might cause to others. This waiver provision was a material condition which was not expressly nor impliedly in respondents' bid and therefore constituted a rejection thereof and a counter-offer.

Subdivision "Fourth" of the proposed contract provides that:

"The Sub-contractor * * * will pay promptly all * * * damages and penalties that may be assessed against the Sub-contractor (or against the contractor on account of the Sub-contractor)".

Subdivision "Seventh" provides that:

"The Sub-contractor shall hold harmless the Contractor, the Owner and the Architect from any and all liability, including costs and expenses in the performance of the sub-contract".

Subdivision "Tenth" provides that:

"The Sub-contractor agrees to clean up and remove all his debris, rubbish and surplus materials as the work progresses. Sub-contractor agrees to keep his own work protected from damage by the elements and from damage likely otherwise to be occasioned in the performance of construction work and to protect all other parts of the work from damage likely to be caused by the Sub-contractor's work, and should any such damage be so caused, to immediately repair the same. Any default of the Sub-contractor in any such cleaning, protection, or repairs, may be remedied by the Contractor, and the cost deducted from the contract price."

And Subdivision "Twelfth" provides that:

"Neither the final payment nor any provision in the contract documents shall relieve the Sub-contractor of responsibility for faulty materials or workmanship; and, unless otherwise specified, he shall remedy any defects and pay for any damage to other work resulting therefrom, which shall appear within one year from the date of completion."

Under these provisions if the $50 per day penalty or any other penalty costs or damages were caused by respondents to appellant, they would be liable therefor, but that respondents waived all damages they might suffer through the fault of others. Such provisions constituted a material departure from respondents' bid and were a rejection thereof, which left respondents free to withdraw such bid without liability.

The contention that respondents are estopped from denying that there was a contract needs little consideration. Here, as we have shown, appellant did not accept respondents' offer but submitted a counter-offer. Under such circumstances it did not rely on the offer but was seeking to get a better one. There is a recog-

nized doctrine of promissory estoppel usually involving offers to make a gift, where although accepted, no binding contract results because there is no consideration. We know of no case where an offeror has been held to be bound by estoppel without an acceptance of his offer. See Restatement of the Law of Contracts, Secs. 86 to 90, Williston on Contracts, Revised Ed., Secs. 692 and 693. In *Northwestern Engineering Co.* v. *Ellerman,* 69 S. D. 397, 10 N. W. 2d 879, where the facts were somewhat similar to our case, it was held that where the offer was accepted and agreed to but no binding contract resulted on account of lack of consideration, the offeror was bound by estoppel. In *James Baird Co.* v. *Gimbel Bros., Inc.,* 2 Cir., 64 F. 2d 344, 345, a similar case except that the offer was not accepted until after the general contract had been awarded and the offer had been withdrawn, and there was no question of lack of consideration, the court held that there was no estoppel until the offer was accepted which came too late after the offer had been withdrawn. There the court said

"the plaintiff might in advance have secured a contract conditional upon the success of its bid"

and that the

"contractors had a ready escape from their difficulty by insisting upon a contract before they used the figures"

and on that account refused to apply the doctrine of promissory estoppel in this kind of a case. Both of these cases are more favorable to the doctrine of promissory estoppel than ours. The last one holds that under the facts of that case there is no estoppel to withdraw a bid at any time before there is an acceptance. Under that doctrine there was no promissory estoppel here, for respondents' bid was not accepted.

Judgment is affirmed. Costs to respondents.

WOLFE, C. J., and McDONOUGH and CROCKETT, JJ., concur.

HENRIOD, J., concurs in the result.