**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 8 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HUSSEIN NAIMIE,

    Plaintiff-Counter-Defendant - Appellee and
Cross-Appellant,

v.

CYTOZYME LABORATORIES, INC., a Utah
corporation; CYTOZYME RESEARCH
COMPANY,

    Defendants-Counter-Claimants - Appellants
and Cross-Appellees.

Nos. 97-4129 & 97-4147

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 95-CV-23)**

---

Gary A. Weston (Scott M. Ellsworth with him on the briefs) of Nielsen & Senior,
Salt Lake City, Utah, for Plaintiff-Counter-Defendant - Appellee and Cross-
Appellant.

Richard B. Ferrari (Beatrice M. Peck, Salt Lake City, Utah, with him on the
briefs), San Diego, California, for Defendants-Counter-Claimants - Appellants
and Cross-Appellees.

---

Before **BRORBY, McWILLIAMS**, and **BRISCOE**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

Defendants-Appellants Cytozyme Laboratories, Inc. and Cytozyme Research Company (collectively "Cytozyme") appeal from the district court's judgment awarding Dr. Naimie damages pursuant to two contracts existing between the parties. Dr. Naimie cross-appeals the district court's calculation of damages. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## I. Background

Cytozyme manufactures and markets nutritional plant and animal growth enhancement products. In late 1980, Cytozyme's president and chief financial officer, Mr. Steve Baughman, asked Dr. Naimie, a chemical engineer, if he would be interested in developing new formulations for Cytozyme products, and offered to pay Dr. Naimie royalties on products using the new formulations. After initial discussions, Mr. Baughman sent a letter to Dr. Naimie in January 1981 confirming Cytozyme's offer to pay royalties in exchange for the transfer of "a new technology base" to be developed by Dr. Naimie. Dr. Naimie then began developing formulations. On September 28, 1981, Mr. Baughman sent another to letter Dr. Naimie which confirmed "[t]his is our agreement to pay you an override ... on completed products that we produce using the technology you have

developed for Cyto-Zyme." Dr. Naimie delivered his first formulation to Cytozyme that September. Approximately one month later, both parties signed a written agreement (the "October 1981 Agreement") which stated: "In order to protect [Dr. Naimie's] interest in the products developed in the past or which may be developed by [Dr. Naimie] in the future, [Cytozyme] agrees to pay to [Dr. Naimie] a royalty pursuant to the attached schedule." Cytozyme also agreed to pay Dr. Naimie an annual $6,000 consulting fee and travel expenses. Dr. Naimie continued to develop formulations for Cytozyme products.[1] Cytozyme began paying royalties to Dr. Naimie in November, 1981.

On May 28, 1985, the parties signed another written agreement ("May 1985 Agreement"). In this agreement, Cytozyme agreed to hire Dr. Naimie as a full time consultant for an annual fee of $60,000 plus travel expenses. The agreement defined Dr. Naimie's consulting duties and further stated "[i]n addition to the base fee, [Dr. Naimie] will, as in the past, be entitled to royalties on products [he has] developed or will develop." The term of the agreement was seven years. However, five years later, in October 1990, Cytozyme terminated the May 1985 Agreement after Dr. Naimie refused to make a presentation. Cytozyme stopped

---

[1] The district court determined Dr. Naimie developed formulations for sixteen Cytozyme products.

making royalty payments to Dr. Naimie after July 1990. By letter dated May 6, 1991, Dr. Naimie terminated Cytozyme's license to use the formulations he developed. When Cytozyme continued to manufacture products that allegedly used his formulations, Dr. Naimie filed this diversity action in district court for breach of contract and declaratory judgment.

After a bench trial, the district court concluded two agreements existed between the parties: a verbal licensing agreement, and a written consulting agreement. First, the court determined a verbal licensing agreement arose between the parties in or about September 1981 and remained in effect until Dr. Naimie's termination in 1990. Pursuant to this verbal licensing agreement, Dr. Naimie licensed to Cytozyme the exclusive right to use his formulations in exchange for royalties on products using those formulations. The license was terminable by either party at will.

Second, the court determined the October 1981 Agreement amounted to a written contract for part-time consulting services and a memorialization of the parties' earlier verbal licensing agreement. When Cytozyme decided to hire Dr. Naimie as a full-time consultant, the parties replaced that portion of the October 1981 Agreement dealing with consulting services with the May 1985 Agreement.

Importantly, the court concluded the May 1985 Agreement was not an integrated contract because it incorporated and referenced the verbal licensing agreement. As such, the May 1985 Agreement did not modify or replace the verbal licensing agreement and, at the time of Dr. Naimie's termination, both the verbal licensing agreement and the May 1985 Agreement were in full force and effect.

Pursuant to the May 1985 Agreement, the court awarded Dr. Naimie unpaid fees for consulting services Dr. Naimie performed in September 1990. Further, the court concluded Cytozyme had breached the verbal licensing agreement by unjustifiably refusing to pay royalties, and awarded Dr. Naimie unpaid royalties from June 1990 through August 1996. On appeal, Cytozyme argues: (1) the district court failed to apply relevant patent law in determining whether Dr. Naimie owned the formulations and whether Dr. Naimie suffered any damage; (2) the district court erred in determining that the May 28, 1985 agreement was not an integrated contract; (3) insufficient evidence exists to support the district court's finding of a verbal licensing agreement; and (4) Dr. Naimie rescinded any license agreement and therefore cannot make a claim under that agreement.

## II. Inapplicability of Federal Patent Law

The district court determined Dr. Naimie "owned" the formulations he developed and Cytozyme's payment of royalties was evidence of that ownership. The court also found Cytozyme had no ownership interest in the formulations and had no right to use the formulations after Dr. Naimie terminated Cytozyme's license. The court specified, however, that its findings addressed the respective ownership rights of the parties and not the rights of third parties not before the court. In other words, the district court applied contract principles to determine the parties' respective rights under the licensing agreement and declined to assess the parties' ownership rights as against the rest of the world pursuant to federal patent principles.

Cytozyme argues inventions may be "owned" only through a federal patent, and because Dr. Naimie did not have a patent, he could not own the formulations at issue in this case and could not receive damages on that basis. Further, Cytozyme alleges the district court's findings regarding ownership create state patent rights – a result the Supreme Court prohibited in *Bonito Boats, Inc. v. Thunder Craft Boats*, *Inc.*, 489 U.S. 141 (1989). We review the district court's findings of fact for clear error and the court's conclusions of law de novo. *Equal Employment Opportunity Comm'n v. Wiltel, Inc.*, 81 F.3d 1508, 1513 (10th Cir.

1996).

The Supreme Court has taken a "pragmatic approach" to dealing with the relationship between federal patent law and state laws relating to intellectual property. *Bonito Boats*, 489 U.S. at 156. In *Bonito Boats*, the Court made clear state regulation of intellectual property must yield to federal patent law to the extent the state regulation "clashes with the balance struck by Congress in our patent laws." *Id.* at 152; *see also Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262-63 (1979) (considering whether state law interfered with the three primary purposes of the federal patent system such that federal law preempted state law). Specifically, a state law may not substantially impede public use of an otherwise unpatentable, publicly known intellectual creation. *Bonito Boats,* 489 U.S. at 156-57. However, the Court emphasized states retain the power to "adopt rules for the promotion of intellectual creation within their own jurisdictions" so long as those rules do not impermissibly interfere with the federal patent scheme. *Id.* at 165; *see also Aronson*, 440 U.S. at 262 ("[T]he states are free to regulate the use of such intellectual property in any manner not inconsistent with federal law.").

In this case, the district court applied state contract law to determine the

parties' rights to the formulations. The Supreme Court addressed a very similar situation in *Aronson*. In *Aronson,* the parties entered into a contract whereby defendant agreed to pay plaintiff a royalty in return for the exclusive right to make and sell a keyholder plaintiff had designed. 440 U.S. at 259. Plaintiff was unable to obtain a patent on her design; however, defendant continued to pay her royalties as provided for in the contract. *Id.* at 259-60. When copies of plaintiff's design began to saturate the market, defendant filed suit, arguing the contract was unenforceable because federal patent law preempted state contract law. *Id.* at 260.

The Supreme Court concluded federal patent law was not a barrier to enforcement of the parties' licensing agreement because enforcement was not inconsistent with purposes of the federal patent system.[2] *Id.* at 262-64 Specifically, the Court noted: (1) the licensing agreement provided royalties to

---

[2] The Supreme Court listed the purposes of the federal patent system as:

> First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions, to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

*Aronson*, 440 U.S. at 262.

the inventor and therefore acted as an incentive to invention; (2) the licensing agreement promoted disclosure because it encouraged the inventor to manufacture her inventions and thereby "display the novel idea which they embody wherever they are seen;" and (3) the licensing agreement did not withdraw ideas from the public domain because the design was not in the public domain before defendant obtained a license. *Id.* at 262-63. The Court concluded:

> Enforcement of these contractual obligations, freely undertaken in arm's- length negotiation and with no fixed reliance on a patent or a probable patent grant, will encourage invention in areas where patent law does not reach, and will prompt the independent innovator to proceed with the discovery and exploitation of his invention."

*Id.* at 266 (internal quotation marks and citation omitted).

Applying these principles to the present case, we conclude enforcement of the licensing agreement pursuant to state law does not undermine the purposes of the federal patent scheme. First, enforcement encourages invention because the royalties provide an "additional incentive to invention," or in this case, an incentive to develop formulations. *See Aronson,* 440 U.S. at 262. Second, enforcement does not conflict with the federal policy of disclosure. In *Aronson,* the Court concluded enforcement promoted disclosure because manufacture of plaintiff's simple keyholder device "inescapably" disclosed its design to the public. *Id.* at 263-69. Here, manufacture of Cytozyme products does not

*automatically* lead to full disclosure of Dr. Naimie's formulations. Nonetheless, enforcement encourages the exploitation of an invention that might otherwise remain undeveloped and therefore inaccessible to the public. Moreover, others remain free to discover and exploit the formulations through reverse engineering or independent creation. *See Bonito Boats*, 489 U.S. at 155. Lastly, enforcement does not withdraw ideas from the public domain as the formulations were not in the public domain before Cytozyme obtained its license. *See Aronson*, 440 U.S. at 263; *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 484 (1974) (holding that state trade secret law did not withdraw ideas from the public domain because trade secrets, by definition, are not placed in the public domain).

Accordingly, we find no conflict with the Court's decision in *Bonito Boats*. Unlike the state law at issue in *Bonito Boats*, enforcement of the licensing agreement in this case does not substantially impede public use of an unpatentable intellectual creation. *See Bonito Boats*, 489 U.S. at 156-57. More important, application of state contract law does not impermissibly interfere with the federal patent scheme, *see Bonito Boats*, 489 U.S. at 165, but rather benefits society by encouraging invention in areas where patent law does not reach, *see Aronson,* 440 U.S. at 266. We therefore conclude the district court correctly applied state

contract law to determine the parties respective ownership rights.[3]

## III. Breach of Contract

Cytozyme contends the district court made several errors in resolving Dr. Naimie's breach of contract claim. First, Cytozyme argues there is no evidence of a verbal licensing agreement. Second, Cytozyme contends the May 1985 Agreement was the only contract in effect at the time of Dr. Naimie's termination and that it was a fully integrated contract which contained all terms between the parties, including payment of royalties. As such, termination of the contract in 1990 extinguished all of Dr. Naimie's rights to royalties. Third, Cytozyme argues even if the alleged licensing agreement existed, Dr. Naimie rescinded that agreement by his May 6, 1991 letter and therefore extinguished his rights under the agreement. We address each of these arguments in turn.

---

[3] Because the district court correctly determined the parties' respective ownership rights without reference to federal patent law, the court was not required to make findings regarding the novelty or nonobviousness of Dr. Naimie's formulations, nor calculate a reasonable royalty pursuant to federal patent law. To the extent Cytozyme challenges the district court's findings regarding the parties' ownership rights under the contract, we conclude those findings are not clearly erroneous based on the parties' correspondence, Cytozyme's payment of royalties, and the technical evidence presented.

1. Existence of a Verbal Licensing Agreement

The district court determined a verbal licensing agreement arose between the parties in or about September 1981. As evidence of this agreement, the district court cited to three letters written by Mr. Baughman to Dr. Naimie dated September 28, 1981, January 3, 1981, and March 1, 1983; the October 1981 Agreement; and the May 1985 Agreement. The issue of whether a contract exists is a mixed question of law and fact. *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 257 (Utah Ct. App. 1997). We review mixed questions under either "the clearly erroneous standard or de novo standard depending on whether the mixed question involves primarily a factual inquiry or the consideration of legal principles." *Armstrong v. Commissioner*, 15 F.3d 970, 973 (10th Cir. 1994). In this case, Cytozyme does not dispute the existence of the evidence cited by the district court, but rather argues the district court erred in concluding those documents evidenced a binding contract. Because that conclusion primarily involves application of legal principles to the facts, we review the district court's conclusion de novo.

Cytozyme contends there is "no evidence" of any oral licensing agreement and, at most, the pre-October 1981 correspondence between the parties amounts to the parties "kick[ing] proposals around for a year." Under Utah law, a contract

is not formed unless there is a meeting of the minds. *Sackler v. Savin*, 897 P.2d 1217, 1220 (Utah 1995). A meeting of the minds requires "assent by all parties to the same thing in the same sense so that their minds meet as to all the terms." *Cessna Fin. Corp. v. Meyer*, 575 P.2d 1048, 1050 (Utah 1978). Hence, no contract exists if the parties merely engage in preliminary negotiations and do not agree to all essential terms. *Crimson v. Western Co.*, 742 P.2d 1219, 1221-22 (Utah Ct. App. 1987). On the other hand, a response to an offer amounts to acceptance if "an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995). The offeree must manifest "'unconditional agreement to all of the terms of the offer ... without material reservations or conditions.'" *Cal Wadsworth Constr. v. City of St. George*, 865 P.2d 1373, 1376 (Utah Ct. App. 1993), *aff'd*, 898 P.2d 1372 (Utah 1995) (quoting *R.J. Daum Constr. Co. v. Child*, 247 P.2d 817, 819 (Utah 1952)). Moreover, an offeree may accept an offer by conduct if that conduct manifests his or her intent to be bound. *Commercial Union Assoc. v. Clayton*, 863 P.2d 29, 34-37 (Utah Ct. App. 1993).

Here, Cytozyme clearly made an offer to Dr. Naimie, at first orally and then

in a letter dated January 3, 1981,[4] to pay royalties in exchange for the use of new formulations Dr. Naimie might develop. The written offer specified the terms of the proposed agreement including amount and timing of the royalty payments. In a letter dated September 28, 1981, Cytozyme confirmed their agreement to pay Dr. Naimie royalties on products they produced using Dr. Naimie's formulations. Dr. Naimie responded to these offers by performing research, testing and developing new formulations, and eventually delivering his first formulation in September 1981. An objective, reasonable person would conclude Dr. Naimie acted in a manner manifesting his intent to be bound by the licensing agreement. We find nothing in the record to indicate Dr. Naimie disagreed with the terms Cytozyme offered nor conditioned his acceptance in any manner. Accordingly, we conclude the parties entered into a valid verbal licensing agreement in September 1981.

The fact that the parties may have intended to subsequently prepare a written instrument does not prevent the verbal agreement from binding the parties. *See Lawrence Constr. Co. v. Holmquist*, 642 P.2d 382, 384 (Utah 1982); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 574 (2d Cir. 1993);

---

[4] Cytozyme inadvertently misdated this letter to read January 3, 1980. The parties agree the correct date was January 3, 1981.

-14-

Restatement (Second) of Contracts § 27 (1979). While it is true that parties who do not intend to enter a binding contract without a writing will not be bound until a written agreement is prepared, *see Sackler*, 897 P.2d at 1221-22, we do not believe the parties expressed such an intent in this instance. Cytozyme and Dr. Naimie agreed to all essential terms of the licensing agreement before they signed the October 1981 Agreement. Moreover, Dr. Naimie delivered his first formulation a month prior to the signing of the October 1981 Agreement. This evidence leads us to conclude the parties manifested an intent to be bound prior to the October 1981 Agreement.[5] *See* Restatement (Second) of Contracts § 27 cmt. c (1979) (listing factors to be considered in determining whether parties formed a contract prior to preparing a written memorial).

2. Integration

The district court concluded the May 1985 Agreement was not integrated, "but rather incorporated and referenced prior agreements, including ... the verbal

---

[5] Cytozyme quotes various segments of Dr. Naimie's trial testimony as evidence that Dr. Naimie did not believe a contract formed until October 1981. While we agree Dr. Naimie's testimony at times seems inconsistent, we believe this is more a reflection of Dr. Naimie's unfamiliarity with legal terms and his difficulty with the English language than a true indication of intent. Based on Dr. Naimie's actions and his testimony as a whole, we conclude he manifested an intent to be bound by the verbal licensing agreement.

agreement regarding payment of royalties." Contract integration is a question of fact. *Bailey-Allen Co. v. Kurzet*, 945 P.2d 180, 190 (Utah Ct. App. 1997). We review the district court's fact findings for clear error. *Wiltel,* 81 F.3d at1513. A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 565 (1985). "On appeal, we view the evidence in the light most favorable to the district court's ruling, and must uphold any district court finding that is permissible in light of the evidence." *Exxon Corp. v. Gann*, 21 F.3d 1002, 1005 (10th Cir. 1994) (internal citation omitted).

An integrated contract is one where "the parties thereto adopt a writing or writings as the final and complete expression of the agreement." *Bailey-Allen Co.*, 945 P.2d at 190 (internal quotation marks and citation omitted). The issue of whether a contract is integrated and thus supersedes prior agreements depends on the parties' intent. *Ringwood v. Foreign Auto Works, Inc.*, 671 P.2d 182, 183 (Utah 1983). In determining intent, "a court may consider extrinsic evidence as to the circumstances of the transaction, including the purpose for which the contested agreement was made." *Id.* In this case, the majority of the May 1985 Agreement relates to Dr. Naimie's full-time consulting duties. The Agreement

mentions royalties only in passing: "In addition to the base fee you will, as in the past, be entitled to royalties on products you have developed or will develop." Both parties testified the primary purpose of the May 1985 Agreement was to make Dr. Naimie a full-time consultant. Based on this evidence, it was not clearly erroneous for the district court to conclude the May 1985 Agreement was not integrated.

## 3. Recission

Cytozyme summarily argues Dr. Naimie "rescinded" the licensing agreement in a letter dated May 6, 1991[6] and thereby canceled his right to damages beyond that date. We find this argument without merit. The May 6 letter does not resemble a recission as that term is commonly defined – a mutual agreement between the parties to discharge and terminate their duties under the contract. *See* Restatement (Second) of Contracts § 283(1) (1979); 5A Arthur

---

[6] Dr. Naimie's letter stated:

As you are aware, the royalties ... due [Dr. Naimie], for the exclusive license to make, use and sell products utilizing the technology developed by Dr. Naimie have not been paid since June, 1990, despite oral and written requests for payment. Accordingly, please be advised that the right of [Cytozyme] to make, use or sell products based on or otherwise making use of the technology developed by Dr. Naimie is hereby terminated effective the date of this letter.

Linton Corbin, Corbin on Contracts § 1236, p. 533 (1964). Rather, the letter

recognizes Cytozyme's breach of the licensing agreement and revokes permission

to use the formulas.[7] The letter contains no indication of an agreement to

discharge contractual duties. Because we find no evidence or legal authority to

support Cytozyme's argument, we conclude the district court correctly declined to

utilize such an analysis.


## IV. Damage Calculation

The district court awarded Dr. Naimie unpaid royalties, accruing between

June 1990 and August 1996, on sixteen Cytozyme products which used Dr.

Naimie's formulations. In his cross-appeal,[8] Dr. Naimie alleges the district court

---

[7] Dr. Naimie's letter is more analogous to those cases in which a party asserts his or her right to suspend performance because of the other party's breach. *See Sprague v. Boyles Bros. Drilling Co.*, 294 P.2d 689, 693 (Utah 1956) ("But where the contract has merely been breached ... the contract may still remain in force, and even though it does, the wronged party may be excused from further performance and recover for loss occasioned to him."); *see also* 5A Arthur Linton Corbin, Corbin on Contracts §1237, p. 547 (1964) ("A mere expression by the injured party of recognition of the fact that a vital breach has occurred and an assertion of his own discharge thereby is no part of an 'agreement to rescind'; it is not an offer to rescind, nor is it the acceptance of such an offer.").

[8] Cytozyme asks us to strike portions of Dr. Naimie's Reply Brief that were not limited to the issues Dr. Naimie raised in his cross-appeal. See Fed. R. App. Proc. 28(c) (1995); 10th Cir. R. 31.2 (1996). We grant Cytozyme's motion and strike those portions of the Reply Brief that relate to issues Dr. Naimie did not cross-appeal. We have not considered those portions of the Reply Brief in reaching our decision on the merits of this case.

made two errors in calculating damages: (1) the district court erred in not awarding royalties through December 1996 as calculated by Dr. Naimie's expert witness, and (2) the district court erred in not awarding royalties on new, post-1990 Cytozyme products. We will not disturb the district court's method of calculating damages on appeal if it has a reasonable basis in the evidence. *Lone Mountain Prod. Co. v. Natural Gas Pipeline Co.*, 984 F.2d 1551, 1558 (10th Cir 1992). We review the district court's determination of the amount of damages resulting from a breach of contract for clear error. *Chaparral Resources, Inc. v. Monsanto Co.*, 849 F.2d 1286, 1289 (10th Cir. 1988).

1. Time Period

Dr. Naimie challenges the district court's award of unpaid royalties through August 1996 and argues he presented sufficient evidence to extend the award through December 1996. Dr. Naimie bears the burden of proving damages resulting from breach of contract. *See Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986); *Bunnell v. Bills*, 368 P.2d 597, 601 (Utah 1962). "If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion," and, if

-19-

the appellant fails to do so, "the court is under no obligation to remedy any failure of counsel to fulfill that responsibility." *Deines v. Vermeer Mfg. Co.,* 969 F.2d 977, 979 (10th Cir. 1992). Moreover, where appellant fails to submit sufficient portions of the record, "an appellate court cannot review the district court's factual findings and must accept them as correct." *Trujillo v. Grand Junction Reg'l Ctr.*, 928 F.2d 973, 976 (10th Cir. 1991); *see also Green v. Johnson*, 977 F.2d 1383, 1387 (10th Cir. 1992) (concluding record submitted by appellant was "insufficient for meaningful review").

To support his argument, Dr. Naimie included in his appendix two trial exhibits prepared by his expert witness. One calculates royalties from June 1990 through August 1996, and the other from September 1996 through December 1996.[9] Dr. Naimie asserts this evidence was uncontradicted. Dr. Naimie also included a very brief portion of trial transcript showing both exhibits were admitted.

This record is insufficient to enable meaningful review of the district

_____

[9] Dr. Naimie claims he amended his damage calculation to include September through December 1996 based on data Cytozyme provided after trial began.

court's findings. We cannot ascertain from the record provided whether Dr. Naimie presented the district court with a choice between the August and December calculations or rather presented them as a whole. We are also unable to determine what, if any, findings the court made with regard to Cytozyme's claim that Dr. Naimie was precluded from claiming additional damages not set forth in the Pretrial Order. We must, therefore, accept as correct the district court's calculation of damages through August 1996 and deny Dr. Naimie's cross-appeal on this issue.

2. Products

The district court based its damage calculation on the sale of sixteen Cytozyme products that the court determined used or currently uses formulations developed by Dr. Naimie. The district court did not award damages on "new post-September 1990 product trade names" because it determined insufficient evidence existed showing Dr. Naimie developed or had an ownership interest in those products. We believe the district court's method of calculating damages was based on a reasonable analysis of the evidence. *Lone Mountain Prod. Co.*, 984 F.2d at 1558. The technical evidence and testimony presented at trial relates almost exclusively to the sixteen Cytozyme products listed in the district court's findings. Moreover, Dr. Naimie can point to no direct evidence that he developed

the formulations for products introduced after September 1990.[10]  Rather, Dr.

Naimie argues the court must infer as much based on Cytozyme employee

testimony and alleged discrepancies between Cytozyme sales invoices and

production reports.  However, it is within the district court's discretion to weigh

the evidence and draw reasonable inferences from the facts.  *Federal Deposit Ins.*

*Corp. v. Hamilton*, 122 F.3d 854, 860 (10th Cir. 1997).  The court's choice

between two permissible views of the evidence "cannot be clearly erroneous."

*Manning,* 146 F.3d at 813.  Based on the evidence presented (or lack thereof), it

was plausible for the district court to conclude Dr. Naimie had no interest in the

post-1990 products.  Accordingly, we conclude the district court's calculation of

damages based on the sixteen listed products was not clearly erroneous.


The judgment of the district court is **AFFIRMED**.

---

[10]  Dr. Naimie had the burden to produce a sufficient evidentiary basis to establish the fact of damages and the extent and amount thereof.  *See Sawyers,* 722 P.2d at 774; *Bunnell,* 368 P.2d at 601.

Nos. 97-4129 & 97-4147, Naimie v. Cytozyme Laboratories, Inc.

**BRISCOE,** Circuit Judge, concurring and dissenting:

I concur in the opinion except for the rejection of Dr. Naimie's contention in his cross-appeal that he presented sufficient evidence to receive damages for unpaid royalties from September through December 1996. I would reverse and remand to the district court for its determination of an additional damage award for the September through December 1996 period and affirm the district court on all other issues.

Cytozyme argues, for the first time on appeal,[1] that Dr. Naimie did not seek damages for the additional period in the pretrial order. This argument is without merit. One of the listed contested issues of fact was "[t]he amount of royalties, if any, owing to [plaintiff] as a consequence of the use of the formula[s] since January 1, 1990." Appellant's App. at 75. Nowhere did Dr. Naimie limit himself to damages accruing prior to September 1996.

At trial, Dr. Naimie presented the testimony of Derek Rasmussen, an accountant, who testified on the issue of damages. Rasmussen prepared Exhibit 59, which included four "schedules" of damages. Schedule 3 set forth the unpaid

---

[1] The majority erroneously assumes Cytozyme asserted this same argument in district court. The record, however, does not bear this out. In its post-trial brief, Cytozyme made only two arguments regarding damages: (1) that Naimie was limited to damages accruing prior to commencement of his lawsuit; and (2) Naimie's entitlement to royalties ended at some point between 1991 and 1994. Appellee's App. at 1347-48. The district court rejected both arguments.

royalties from June 1990 through August 1996. Appellee's App. at 1662-63. The total amount of damages listed in Schedule 3 ($482,753) coincided with the amount claimed in the pretrial order. Id. at 1663. Exhibit 59 also included Schedule 3a, which Rasmussen prepared based upon documents allegedly received from Cytozyme after the trial began (and after the pretrial conference was conducted). Schedule 3a sets forth the royalties that accrued between September and December 1996. Id. at 1664.

Based upon the evidence presented to the district court and its rulings that the parties had an enforceable agreement concerning royalty payments and that Cytozyme breached that agreement, there is no conceivable reason for not awarding Dr. Naimie damages for the September through December 1996 period. Although the district court's findings of fact are not crystal clear, it appears the court began with the figure of $482,753 (the original total of unpaid royalties through August 1996 set forth in Schedule 3), made two deductions in accordance with arguments by Cytozyme in its post-trial motion, and arrived at the final damage figure of $377,526.45. Unfortunately, there is no indication in the court's order whether it considered the issue of damages for the period of September through December 1996 or, if it did, why it concluded Dr. Naimie was not entitled to damages for that period. Dr. Naimie may not be entitled to the full $15,085 amount he claims on appeal because part of this claim encompasses royalties for

new products that are not based on his formulas.  However, he is entitled to some measure of damages for unpaid royalties for the September through December 1996 period.