**COMMERCIAL UNION ASSOCIATES,**
a Utah general partnership,
Plaintiff and Appellee,

v.

**John N. CLAYTON, David N. Clayton, T. Scott Lindley, jointly doing business as Clayton Plastic Surgery Specialists, and Clayton Plastic Surgery Associates, a Utah corporation, Defendants and Appellants.**

No. 920335–CA.

Court of Appeals of Utah.

Oct. 6, 1993.

Rehearing Denied Nov. 17, 1993.

B. Ray Zoll, Salt Lake City, for defendants and appellants.

Steven G. Johnson, Midvale, for plaintiff and appellee.

Before BENCH, JACKSON and GARFF,[1] JJ.

## OPINION

BENCH, Judge:

Defendants appeal from the trial court's rulings pertaining to a lease agreement with Plaintiff. We affirm.

---

**1.** Senior Judge Regnal W. Garff, acting pursuant to appointment under Utah Code Ann. § 78–3– 24(10) (1992).

## FACTS

Plaintiff Commercial Union Associates (Commercial Union) owns and operates a commercial office building in Midvale, Utah. At the time of this action, Clayton Plastic Surgery Associates (Clayton Plastic Surgery) was a medical corporation specializing in plastic surgery. Defendants Dr. John N. Clayton, Dr. David N. Clayton, and Dr. T. Scott Lindley were employees of Clayton Plastic Surgery. Dr. John L. Clayton was the president and an employee of Clayton Plastic Surgery.

Clayton Plastic Surgery was interested in providing services in a free-standing facility that would qualify them for reimbursements from third party insurance carriers, including Medicaid and Medicare. To this end, in 1988, Dr. Lindley contacted Lee Teerlink, a leasing agent in Salt Lake City, and inquired about leasing space for a medical facility.

Mr. Teerlink showed Dr. Lindley existing medical facilities in the Commercial Union building. Dr. Lindley requested that Mr. Teerlink provide a written comparison of the costs of building a medical facility in Commercial Union's building and in another building that Mr. Teerlink had shown to Dr. Lindley. Mr. Teerlink provided the written comparison, using a figure of $44.00 per square foot. This figure was the cost of building the existing medical facility in the Commercial Union building.

Clayton Plastic Surgery requested that Mr. Teerlink locate an architect to design the medical facility in Commercial Union's building. Mr. Teerlink contacted an architect who did some initial design work. In September 1988, Clayton Plastic Surgery replaced the first architect with a second architect.

In early September 1988, Brad Berenson, attorney for Dr. Lindley, began lease negotiations with Mr. Teerlink. Mr. Berenson did not indicate to Mr. Teerlink that Clayton Plastic Surgery was interested in "I-certification," the certification necessary to allow medical providers to qualify for reimbursements from third party insurance carriers. Mr. Berenson made several amendments to Commercial Union's standard lease form during the negotiations.

On September 17, 1988, Dr. John L. Clayton went to Mr. Teerlink's office and executed a lease agreement for space in the Commercial Union building. He signed the lease as president of Clayton Plastic Surgery and paid to Mr. Teerlink the first lease payment.[2] The lease was to take effect on December 1, 1988, and was for a term of five years.

Blaine Savage, a partner in Commercial Union, rejected the lease on the ground that he did not want a corporate lessee without guarantors. Mr. Savage sent a new lease to Clayton Plastic Surgery. On October 18, Doctors T. Scott Lindley, John N. Clayton and David N. Clayton signed the new lease as guarantors. However, the lessee signature line on the new lease was left blank.

Upon receipt of the second lease, signed only by the guarantors, Mr. Savage released the obligations of existing tenants that were leasing but not occupying the space Clayton Plastic Surgery intended to occupy. The released tenants were making lease payments to Commercial Union.

Clayton Plastic Surgery applied for a $300,000 loan from Valley Bank & Trust (Valley Bank) to construct the medical facility. Valley Bank issued a loan commitment to Clayton Plastic Surgery in the amount of $300,000 for leasehold improvements in Commercial Union's building.

In November 1988, Dr. Lindley instructed Joel Madsen, a general contractor and president of TCM Corporation, to proceed with the demolition of the existing facilities in Commercial Union's building. Mr. Madsen demolished a portion of the facilities, and Clayton Plastic Surgery paid Mr. Madsen for his services. The demolition rendered a substantial portion of the facilities in Commercial Union's building completely unusable.

---

2. Dr. John L. Clayton is not a party to this action, apparently because he never signed the lease, in an individual capacity, either as lessee or as a guarantor.

Clayton Plastic Surgery made lease payments to Commercial Union for the months of December 1988, and January, February, March, and two-thirds of April 1989. Clayton Plastic Surgery purchased equipment for use in the leased premises. Clayton Plastic Surgery also printed stationery showing the address of its business address in Commercial Union's building, and made arrangements to have its corporate computer moved to Commercial Union's building.

In March 1989, Dr. Lindley left Clayton Plastic Surgery and opened his own office near Alta View Hospital. Dr. John N. Clayton, as a result of Dr. Lindley's leaving, notified Valley Bank that Clayton Plastic Surgery no longer needed the $300,000 loan committed to them for the construction in Commercial Union's building. Thereafter, Clayton Plastic Surgery failed to follow through with its application with the State for I-certification for the facility. After April 1989, Clayton Plastic Surgery failed to make the monthly lease payments.

Commercial Union, upon learning that Clayton Plastic Surgery intended to repudiate the lease, attempted to obtain new tenants to mitigate its damages. Commercial Union eventually obtained new tenants, but was required to remodel the space at great expense.

In May 1989, Commercial Union instituted an action in district court against Clayton Plastic Surgery, as lessee, and Doctors John N. Clayton, David N. Clayton, and T. Scott Lindley, as guarantors. Commercial Union alleged that Clayton Plastic Surgery breached the lease and asked for damages to cover lease payments, rebuilding the de-

molished portions, and attorney fees and costs. Clayton Plastic Surgery filed an answer, including nineteen affirmative defenses attacking the validity of the lease. Clayton Plastic Surgery also alleged that Commercial Union breached several conditions in the lease.

Following a bench trial, the trial court ruled in favor of Commercial Union. The trial court concluded that there was a valid lease between the parties and that Clayton Plastic Surgery had breached the lease. The trial court awarded Commercial Union damages in the amount of $242,533.56, and attorney fees in the amount of $49,781.50, against Clayton Plastic Surgery and the guarantors. This appeal followed.

## ISSUES

Among the issues raised on appeal, defendants urge that the trial court erred by: (1) not holding the lease invalid under the statute of frauds; (2) holding the lease valid through part performance; (3) not holding the lease invalid due to a manifest lack of mutual assent by the parties; (4) not holding the lease invalid due to a failure of the parties to reach a meeting of the minds; (5) holding the lease valid since various express conditions in the lease were never fulfilled; and (6) not holding that the lease failed due to impossibility of performance or frustration of purpose.

## ANALYSIS

### Statute of Frauds

Clayton Plastic Surgery argues that because the second lease [3] was not signed by the lessee, as the party to be

---

**3.** Clayton Plastic Surgery argues that the trial court erred by reading the first lease, signed by Dr. John L. Clayton on behalf of the corporation but rejected by Mr. Savage because it lacked guarantors, in combination with the second lease, signed by the guarantors but not signed by a lessee, so as to create a single unified document. We agree.

The trial court concluded that the two leases could be read together as a unified document:

    12. The lease agreement signed by [Clayton Plastic Surgery] on September 29, 1988 and the lease agreement signed by the individual guarantors have identical provisions, con-

cern the same subject matter, and should be read together as one document in determining the rights and interests of the parties.

Mr. Savage testified at trial that he rejected the first lease because it was not signed by guarantors and he did not want a lease signed only by a corporate lessee. Since the first lease was admittedly rejected by Mr. Savage, it was error for the trial court to read it in combination with the second lease to create a single unified document. However, this error is harmless since we hold in this opinion that, even without the first lease, there was an enforceable agreement between the parties.

charged, the trial court erred by not holding that it was within the statute of frauds and therefore unenforceable. We disagree.

■ Utah Code Ann. § 25-5-3 (1989) provides, in relevant part:

Every contract for the leasing for a longer period than one year, or for the sale, of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing *subscribed by the party by whom the lease or sale is to be made....*

(Emphasis added.)

Section 25-5-3 was at issue in *Williams v. Singleton,* 723 P.2d 421 (Utah 1986), where the supreme court, faced with a similar argument, held, in relevant part:

Plaintiffs' reliance on statutory language that "the party to be charged" in this case should be defendants is misplaced. That language does not appear in the sections pertinent to their situation. Section 25-5-3 specifically requires that the contract be "in writing subscribed by the party by whom the [lease or] sale is to be made." Certainly this section governing land contracts, as well as section 25-5-1 governing conveyances by deed, mandates expressly that a document to be enforceable under the statute of frauds must be subscribed by the party granting the conveyance.

*Id.* at 424 (citations omitted). By its own unambiguous terms, section 25-5-3 requires only the signature of the lessor to take the document out of the statute of frauds.

Clayton Plastic Surgery argues, however, that we should combine section 25-5-3 with Utah Code Ann. § 25-5-4(1) (1989), which provides in relevant part:

In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof, is in writing subscribed by the party to be charged therewith:

(1) Every agreement that by its terms is not to be performed within one year from the making thereof.

Clayton Plastic Surgery claims that since this section applies to contracts "that by [their] terms [are] not to be performed within one year," we should read the statutory scheme underlying the statute of frauds to require that even contracts for the leasing of land for a period of more than one year must be signed by the lessee since that is the "party to be charged."

Clayton Plastic Surgery's argument is unavailing since section 25-5-4 does not apply to contracts for the leasing of land.[4] "When two statutory provisions appear to conflict, the more specific provision governs the more general provision." *Lamarr v. Utah State Dep't of Transp.,* 828 P.2d 535, 541-42 (Utah App.1992) (quoting *Perry v. Pioneer Wholesale Supply Co.,* 681 P.2d 214, 216 (Utah 1984)). Section 25-5-3 explicitly and specifically governs contracts for the leasing of land. Clayton Plastic Surgery's suggestion that we should make additions and alterations to the more specific provision is therefore without justification.

Under section 25-5-3, the statute of frauds requires only that the document be signed by the party granting the lease. The lease in this case was signed by Mr. Savage as the representative of the lessor, Commercial Union, and therefore, is not invalid under the statute of frauds.

### Clayton Plastic Surgery's Intent Under the Lease

Clayton Plastic Surgery argues that the trial court erred in holding that Clayton

---

**4.** Section 25-5-4 applies only to the following specific situations:

(1) Every agreement that by its terms is not to be performed within one year from the making thereof.
(2) Every promise to answer for the debt, default or miscarriage of another.
(3) Every agreement, promise or undertaking made upon consideration of marriage, except mutual promises to marry.
(4) Every special promise made by an executor or administrator to answer in damages for the liabilities, or to pay the debts, of the testator or intestate out of his own estate.
(5) Every agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation.

Plastic Surgery had ratified the lease through the doctrine of part performance. Clayton Plastic Surgery claims that the equitable doctrine of part performance cannot be used to sue for money damages for breach of an oral contract, and that it cannot be used to take an oral contract out of the statute of frauds.

However, Clayton Plastic Surgery's performance was not being used to invoke the equitable doctrine of part performance. Instead, Clayton Plastic Surgery's performance was used to demonstrate its intent to be bound by the lease agreement. Clayton Plastic Surgery nonetheless argues that it never expressed its assent or acceptance, in any form, to the lease presented by Commercial Union. The question presented here is therefore whether Clayton Plastic Surgery acted in a manner manifesting its intent to be bound by the lease even though it did not sign the lease as lessee.

■ It is axiomatic that a party may become bound through its performance to a contract that it has not signed:

It is a fundamental contract law that the parties may become bound by the terms of a contract even though they did not sign the contract, where they have otherwise indicated their acceptance of the contract, or led the other party to so believe that they have accepted the contract.

*Ercanbrack v. Crandall–Walker Motor Co.*, 550 P.2d 723, 725 (Utah 1976) (quoting 17 Am.Jur.2d Contracts § 70). "It is established that a signature is not always necessary to create a binding agreement." *City and County of Denver v. Adolph Coors Co.*, 813 F.Supp. 1476, 1480 (D.Colo.1993) (quoting *Presidential Motor Yacht Corp. v. President Marine, Ltd.*, 753 F.Supp. 7, 13 (D.D.C.1990)). It is likewise established that "the purpose of a signature is to demonstrate 'mutuality of assent' which could as well be shown through the conduct of the parties." *Id.; see also NLRB v. Local 825, International Union of Operating Engineers*, 315 F.2d 695, 699 (3d Cir.1963) ("That [a party] failed to sign the agreement is immaterial for any written contract

though signed only by one of the parties binds the other if he accepts it and both act in reliance on it as a valid contract."); *Tow v. Miners Memorial Hosp. Assoc. Inc.*, 305 F.2d 73, 75 (4th Cir.1962) ("If a person has accepted a written agreement and has acted upon it he is bound by it, although he may not have set his hand to the document.").

The trial court found that after the guarantors signed the second lease, Clayton Plastic Surgery acted as if there was a valid contract. Specific findings of the trial court include the following:

26. Each of the defendants testified they intended [Clayton Plastic Surgery] to be the lessee under the lease agreement. The parties believed that [Clayton Plastic Surgery] had signed the lease agreement. None of the parties realized that [Clayton Plastic Surgery] had failed to execute the lease agreement as of October 1988. In fact, [Dr. Lindley] was "amazed" when he first learned in March 1989, five months later, that [Clayton Plastic Surgery] had not signed the lease. [Clayton Plastic Surgery] intended to sign the lease as lessee.

27. Lee Teerlink gave the defendants keys to [Commercial Union's building] and they periodically visited the premises....

28. The day after the lease was signed, on October 19, 1988, [Dr. Lindley] called Blaine Savage and expressed appreciation that the lease was finally signed and that he was glad the matter was finally completed.

29. In order to place the defendants in [Commercial Union's building], [Commercial Union] was required to release existing tenants (U–Care, A.L. Williams and Fort Union Imaging) from their lease obligations with [Commercial Union]. At the time of their release, U–Care, A.L. Williams and Fort Union Imaging were making lease payments to [Commercial Union]. This fact was explained to defendants by Mr. Teerlink.

30. [Commercial Union] knew that the defendants had hired an architect to

design and had hired a general contractor to perform the build-out. Following the October 19, 1988 telephone call from [Dr. Lindley], [Commercial Union] released U–Care, A.L. Williams and Fort Union Imaging from their lease obligations so that defendants could move into [Commercial Union's building]. [Commercial Union] would not have released these tenants if [Clayton Plastic Surgery] had not entered the lease agreement.

31. The doctors had more experience in certification requirements than plaintiff. The doctors had purchased a thick binder containing all the certification requirements and [Dr. Lindley] had experience with certification on at least one prior occasion. Defendants communicated regularly with the architect in order to make decisions concerning architectural matters. Defendants were invoiced by the architect for architectural services and paid the architect for such services by corporate checks signed by corporate employees.

    . . . .

33. Defendants hired a general contractor, TCM Corporation, to perform demolition services in [Commercial Union's building].

34. Joel Madsen, President of TCM Corporation, corresponded regularly with the defendants both in writing and by telephone with regard to demolition and build-out matters. Joel Madsen also met with [Commercial Union] to obtain approval for certain modifications of the building for defendants such as moving a column and creating three new exterior doors. Such approval was required by the lease agreement.

35. On November 22, 1988, [Dr. Lindley] instructed Joel Madsen by telephone to proceed with demolition of the operatory areas in [Commercial Union's building]. In early December of 1988, pursuant to the instruction of defendants, TCM proceeded to demolish a portion of [Commercial Union's building]. This demolition occurred after the start of the lease term on December 1, 1988. The demolition rendered a substantial portion of the leased premises completely unusable. Defendants did not rebuild the demolished portion of the leased premises.

    . . . .

37. Defendants were aware that the lease term began December 1, 1988.

38. Defendants paid Joel Madsen for his demolition services performed at the [Commercial Union's] building. The check for the demolition work was paid with a [Clayton Plastic Surgery] corporate check signed by a corporate employee.

    . . . .

40. Defendants purchased equipment for the [Commercial Union] leased premises after the lease was signed. . . .

41. Defendants purchased stationary [sic] and envelopes with letterhead showing the address of [Clayton Plastic Surgery] at 1275 East, Fort Union Boulevard, Midvale, Utah, the address of the leased premises.

42. Defendants made arrangements to have the [Clayton Plastic Surgery] corporate computer moved to [Commercial Union's building].

43. In order to build out the premises, defendants contacted several financial institutions for potential loans. Defendants applied for a loan at Valley Bank & Trust in the sum of $300,000. [Dr. David N. Clayton] told the loan officer, Paul Sommer, that the $300,000 loan amount was to be used for leasehold improvements in their new offices at [Commercial Union's building].

44. Valley Bank & Trust issued a loan commitment to defendants in the amount of $300,000 for the purpose of financing leasehold improvements in the building located at approximately 7000 South 1300 East, Salt Lake City, Utah, the approximate address of [Commercial Union's building].

45. [Clayton Plastic Surgery] made lease payments to [Commercial Union] with corporate checks for the months of December 1988, and January, February, March and two-thirds of the month of

April of 1989. [Dr. Lindley] wrote a check to [Commercial Union] for a one-third portion of the April 1989 lease payment. These checks all correspond with the lease payments as required by the lease agreement and were written after the bids were submitted and, except for the December payment, the defendants knew the actual cost of the build out.

. . . .

65. Defendants, up until April of 1989, acted in all ways as though the lease was valid and binding on them.

■ This court will not lightly disturb a trial court's findings of fact. In challenging a trial court's findings of fact on appeal, an appellant must marshal all "the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be 'against the clear weight of the evidence,' thus making them 'clearly erroneous.'" *Ohline Corp. v. Granite Mill*, 849 P.2d 602, 604 (Utah App. 1993) (citations omitted). If the appellant fails to marshal the evidence, we will assume that the record supports the trial court's findings of fact and proceed to review the accuracy of the trial court's conclusions of law. *See Grayson Roper Ltd. v. Finlinson*, 782 P.2d 467, 470 (Utah 1989); *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985).

Clayton Plastic Surgery has failed to marshal the evidence in support of the trial court's findings. Instead, Clayton Plastic Surgery has merely selected facts and excerpts of testimony from the trial that support its position and then reargued those facts to this court. This tactic ignores the burden that Clayton Plastic Surgery must carry to properly challenge the trial court's findings of fact. Because Clayton Plastic Surgery has failed to marshal the evidence, we accept the trial court's findings of fact as accurate and review the trial court's conclusions based on those findings.[5] *See Ohline*, 849 P.2d at 604.

Based on its findings, the trial court concluded that Clayton Plastic Surgery acted in a manner manifesting its intent to be bound by the contract as follows:

10. Defendant [Clayton Plastic Surgery] substantially performed under the lease agreement until its breach thereof by failure to make lease payments beginning in May 1989.

11. The doctrine of specific performance is available to Plaintiff.

. . . .

13. The lease agreement commenced December 1, 1988, although defendants and their contractor had possession of the premises prior to that date for purposes of demolition.

. . . .

18. The defendants' intent to validate the lease agreement is adequately shown by their actions.

19. Defendants are estopped from denying the validity of the lease agreement.

20. [Commercial Union] reasonably relied on the words and actions of defendants.

. . . .

22. Defendants ratified the lease agreement by performing thereunder for several months.

■ We review a trial court's conclusions of law under a correction of error standard. *Ohline*, 849 P.2d at 605. "[W]e accord conclusions of law no particular deference, but review them for correctness." *Id.* (quoting *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985)).

■ In the present case, Clayton Plastic Surgery acted in every respect as if it were under contract with Commercial Union. It took possession of the leased premises, paid monthly lease payments for several months, hired an architect and a contractor, and demolished part of the building. Clayton Plastic Surgery's actions also led Com-

---

**5.** Clayton Plastic Surgery has failed to marshal any evidence on any of the issues on appeal. We therefore assume that all the findings of fact of the trial court are supported by the record.

Consequently, we treat Clayton Plastic Surgery's issues on appeal as raising only questions of law.

mercial Union to believe that Clayton Plastic Surgery intended to be bound by the lease. In reliance on Clayton Plastic Surgery's actions, Commercial Union released paying tenants from the Commercial Union building in order to make the space available to Clayton Plastic Surgery. Clayton Plastic Surgery clearly indicated its acceptance of the lease agreement and its intention to be bound by it, and led Commercial Union to believe it intended to be bound by the lease agreement. *See Ercanbrack*, 550 P.2d at 725 (a party may become bound by a contract it has not signed where it has indicated its acceptance and led the other party to believe that it accepted the contract). The trial court was therefore correct in concluding, based upon its findings and the applicable law, that Clayton Plastic Surgery manifested its intent to be bound under the lease agreement.[6]

### Meeting of the Minds

Clayton Plastic Surgery argues that the trial court erred when it held that there was a meeting of the minds between Clayton Plastic Surgery and Commercial Union to the terms of the lease agreement.

■ A meeting of the minds between contracting parties is essential to the formation of any contract:

> A condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or implicitly, with sufficient definiteness to be enforced.

*Pingree v. Continental Group of Utah, Inc.*, 558 P.2d 1317, 1321 (Utah 1976) (quoting *Valcarce v. Bitters*, 12 Utah 2d 61, 63, 362 P.2d 427, 428 (1961)).

■ Clayton Plastic Surgery presents this court with testimony from trial that it claims demonstrates a lack of a meeting of the minds. The trial court's findings, however, clearly indicate that there was a meeting of the minds with regard to the provisions of the lease. Clayton Plastic Surgery has failed to properly challenge the findings of the trial court, and we will not conduct a de novo review of the facts presented to the trial court. Based on its findings, the trial court concluded that "[t]here was a meeting of the minds as to the terms of the lease agreement." The trial court was therefore correct in concluding, based on its findings and the applicable law, that there was a meeting of the minds between Clayton Plastic Surgery and Commercial Union as to the terms of the lease agreement.

### Express Conditions .

Clayton Plastic Surgery argues that the trial court erred in holding the lease valid when express conditions precedent were never met. Specifically, Clayton Plastic Surgery claims that obtaining an I-certification and commencing the lease as per Section 2 of the lease agreement were express conditions that were never fulfilled.[7]

■ "A condition precedent is one which must be performed by the one party to an existing contract before the other party is obligated." *Kilianek v. Kim*, 192 Ill.App.3d 139, 139 Ill.Dec. 213, 215, 548 N.E.2d 598, 600 (Ill.App.Ct.1989) (citation omitted); *see also Associated Inv. Co. v. Cayais*, 55 Utah 377, 381, 185 P. 778, 779 (1919) ("Conditions precedent call for the performance of some act or the happening of some event after a contract is entered into and upon the performance or happening of which its obligations are made to

---

**6.** Clayton Plastic Surgery argues that the trial court erred in holding the guarantors liable as principals under the lease. However, in light of our holding in this section that Clayton Plastic Surgery was bound by the lease as lessee, this argument is without merit.

**7.** Section 2 of the lease agreement provides:
> The term of this lease shall be for a period five (5) years, commencing on the first day of the month succeeding the occupancy date....

> The words "occupancy date" wherever used in this Lease shall be deemed to refer to the date fifteen (15) days after a temporary or final certificate of fitness for occupancy has been issued by the appropriate governmental authorities having jurisdiction of the Leased Property or as soon as Lessee commences to do business in, upon or from the Leased Property, whichever is first.

depend."). Courts must respect express conditions precedent.

> Generally speaking, neither of the parties, nor the court has any right to *ignore or modify conditions which are clearly expressed* merely because it may subject one of the parties to hardship, but they must be enforced "in accordance with the intentions as ... manifested by the language used by the parties to the contract."

*Jones v. Acme Bldg. Prods., Inc.,* 22 Utah 2d 202, 206, 450 P.2d 743, 746 (1969) (quoting *Ephraim Theatre Co. v. Hawk,* 7 Utah 2d 163, 321 P.2d 221 (1958)). Determining whether the requirements claimed by Clayton Plastic Surgery were express conditions turns on the contract language and the intent of the parties:

> Whether a promise is conditional depends upon the parties' intent, which is derived from a fair and reasonable construction of the language used in light of all the circumstances when the parties executed the contract.

*Porter v. Groover,* 734 P.2d 464, 465 (Utah 1987) (citations omitted).

■■■ The trial court found that the issue of I-certification did not arise until after the guarantors executed the lease. Based on this finding, the trial court concluded that "I-certification is not a condition to the lease agreement and was never warranted by Plaintiff." Since the issue of I-certification did not arise until after the lease was in existence, it could not have been a condition precedent. Moreover, as the trial court found, the burden of obtaining I-certification was not on Commercial Union but on Clayton Plastic Surgery. Clayton Plastic Surgery was required to complete the application process for I-certification with the State. Clayton Plastic Surgery never completed the process and therefore never obtained I-certification despite the trial court's findings that I-certification was possible. Therefore, we conclude that the trial court did not err in holding that I-certification was not a condition precedent.

■■■ Clayton Plastic Surgery further claims that there was not a valid certificate of fitness for occupancy nor was it conducting business in the leased premises as required by Section 2 of the lease. However, the trial court found that there was a valid certificate of occupancy at the time the lease term began on December 1, 1988. Section 2 of the lease required that before the lease could become effective there had to be either a "temporary or permanent certificate of fitness for occupancy ... *or* as soon as the Lessee commences to do business in, upon or from the Leased Property, whichever is first." (Emphasis added.) Since there was a valid certificate of fitness for occupancy on December 1, 1988, Section 2 was fulfilled and did not release Clayton Plastic Surgery from its obligations under the lease agreement.

We further conclude that there were no express conditions left unfulfilled that would have released Clayton Plastic Surgery from its obligations under the lease. The trial court did not err, therefore, in concluding that there were no express conditions precedent that would invalidate the lease agreement.

### Impossibility of Performance

Clayton Plastic Surgery claims that the trial court erred in not releasing Clayton Plastic Surgery from its obligations under the lease because performance under the lease had become impossible. Clayton Plastic Surgery argues that performance under the lease became impossible because of the increased cost of construction necessary to obtain I-certification, and that Commercial Union must bear the responsibility for this impossibility.

■■■ The contractual defense of impossibility is designed to relieve a party of its obligation under a contract where its performance has been rendered *legally impossible.* The defense has been defined as follows:

> Under the contractual defense of impossibility, an obligation is deemed discharged if an unforeseen event occurs after formation of the contract and without fault of the obligated party, which events makes performance of the obli-

gation impossible or highly impracticable.

*Western Properties v. Southern Utah Aviation*, 776 P.2d 656, 658 (Utah App.1989) (footnotes omitted); *see also Holmgren v. Utah–Idaho Sugar Co.*, 582 P.2d 856, 861 (Utah 1978) ("a party may be relieved of performing an obligation under a contract where supervening events, unforeseeable at the time the contract is made, render performance of the contract impossible"). The test for impossibility is not hard and fast, but must take into consideration at what point performance under the contract can no longer be reasonably required: "It is now recognized that '[a] thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.'" *Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 315 (D.C.Cir.1966) (quoting *Mineral Park Land Co. v. Howard*, 172 Cal. 289, 156 P. 458, 460 (Cal.1916)).

▮ The trial court found that Clayton Plastic Surgery did not mention I-certification until after the lease had been signed by the guarantors. Moreover, the trial court found that the actual cost for the construction of the medical facility in the leased space in order to qualify for I-certification would be $38.98 per square foot for a total of $284,523. This figure is less than the $44.00 per square foot Clayton Plastic Surgery had initially anticipated, and well within the loan amount of $300,000 that Clayton Plastic Surgery was approved for by Valley Bank. The trial court also found that it was physically possible to convert the leased premises in order to gain I-certification, and that it was very likely that the State would grant I-certification for the leased premises. Based on these findings the trial court concluded that "[t]he lease was neither impossible to perform nor was its purpose frustrated."

There was no unforeseeable or supervening event in this case that rendered performance under the lease agreement impossible or impracticable. Moreover, the cost of the construction was neither "excessive" nor "unreasonable." In fact, the trial court found that the cost of construction was actually less than anticipated by Clayton Plastic Surgery in preliminary negotiations. We conclude therefore that the trial court did not err in ruling that the defense of impossibility was not available to Clayton Plastic Surgery.[8]

## Additional Issues

We have reviewed Clayton Plastic Surgery's additional arguments on appeal and conclude that they are without merit. *State v. Carter*, 776 P.2d 886, 888 (Utah 1989) (appellate court not required to analyze and address in writing each argument and issue properly before it).

## CONCLUSIONS

The lease signed by the guarantors but not by the lessee satisfies the statute of frauds. Clayton Plastic Surgery acted in a manner manifesting its assent to and its intent to be bound by the lease. There was a meeting of the minds to the lease agreement. The lease contained no express conditions precedent to its operation. The lease was not void due to impossibility or frustration of purpose.

Commercial Union requests, and is entitled to recover under the lease agreement, attorney fees and costs on appeal. We therefore remand the case for a determination of attorney fees and costs incurred by Commercial Union on appeal.

GARFF, J., concurs.

JACKSON, J., concurs in result.

---

8. In light of our holding in this section, we conclude that the trial court was correct in ruling that Clayton Plastic Surgery could not be released from its obligations because of a frustration of purpose.