**2023 UT App 124**

# THE UTAH COURT OF APPEALS

GEOMETWATCH CORPORATION,
Appellant,
*v.*
UTAH STATE UNIVERSITY,
Appellee.

Opinion
No. 20210654-CA
Filed October 19, 2023

First District Court, Logan Department
The Honorable Brian G. Cannell
No. 190100294

Peggy Tomsic, James E. Magleby, Adam Alba, and
Yevgen Kovalov, Attorneys for Appellant

Sean D. Reyes, Peggy E. Stone, and
Joshua D. Davidson, Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1      GeoMetWatch Corporation (GMW) sued Utah State University (USU) for breach of a shareholder agreement. USU denies ever signing the agreement, and no copy of the agreement signed by USU exists in the record. Nevertheless, GMW asserted that USU had manifested its assent to the agreement in other ways. At the close of fact discovery, USU moved for summary judgment, asserting that, even though it was a shareholder of GMW, it had never signed or otherwise agreed to the terms of the agreement in question, and that the agreement was in any event unenforceable under the statute of frauds. GMW opposed USU's motion, and also filed a motion of its own asking for more time to

conduct discovery. The district court granted USU's motion, concluding that, on this record, no genuine issue of material fact existed about whether USU had agreed to be bound by the shareholder agreement. The court also denied GMW's motion for additional discovery. GMW appeals both rulings, and we affirm.

BACKGROUND

¶2 GMW is a "global weather services company" that sought to develop a weather-detecting satellite sensor system. In 2009, GMW entered into discussions with USU about the university acting as a potential contractor to build part of the sensor system. Eventually, USU agreed to work with GMW through an affiliated corporate entity, the Utah State University Research Foundation (USURF), a wholly owned subsidiary of USU. In 2010, as part of this arrangement, USURF purchased shares of GMW stock, paying about $2 million for a 5.77% ownership interest in GMW.

¶3 In January 2013, USU asked GMW to issue USU a stock certificate for the GMW shares that had been earmarked for USURF. About a month later, GMW delivered the stock certificate to USU, along with a cover letter signed by GMW's president (President). The certificate—dated October 2012 and signed by President—proclaimed that "Utah State University" was the owner of "Six Hundred Sixty Six Thousand Six Hundred Sixty Seven" shares of GMW stock. Other than a request that USU confirm receipt of the certificate, neither the cover letter nor the certificate contained any restrictions or asked USU to take any action; in particular, GMW did not reference any condition that needed to be fulfilled before USU became a shareholder of GMW, and GMW did not at that time ask USU to sign any sort of written agreement in order to become a shareholder.

¶4 Thereafter, USU behaved, in material ways, consistent with its status as a GMW shareholder. It held itself out to others

as a company shareholder. Several months later, it asked that a USU representative be named to GMW's board of directors. And in 2014, it asked to exercise its right, "[a]s a shareholder of" GMW, to inspect GMW's books and records.

¶5 In April 2013, about two months after sending USU the unrestricted stock certificate, GMW sent USU two copies of a "Shareholder Book" containing several different agreements; GMW asked USU to sign both copies of the agreements, keep one signed copy, and send the other back to GMW. One of the agreements in the Shareholder Book was a "Preferred Stock Purchase Agreement" (the Purchase Agreement) under which USU would, among other things, agree that it was a purchaser of the stock. Another of the agreements in the Shareholder Book was a "Shareholder Agreement" which contained the following provisions, among others:

- A "business opportunity" provision under which each shareholder would agree that "any business opportunity that comes to the attention of" the shareholder "belongs to the [c]orporation."

- A non-competition provision under which each shareholder would agree not to compete with GMW "while a [s]hareholder" and "for a period of 2 years" thereafter.

- A non-solicitation provision under which each shareholder would agree, "while a [s]hareholder" and "for a period of 2 years" thereafter, not to solicit GMW employees to leave the company.

¶6 USU maintains that it did not sign any of the agreements in the Shareholder Book, including the Shareholder Agreement;

indeed, USU officials that would have been the ones likely to have signed such agreements testified that they did *not* sign them. GMW takes issue with USU's contention that it did not sign the agreements, but it has been unable to locate or produce a copy of any of them that was signed by anyone at USU, and it has been unable to present any direct evidence (e.g., eyewitness testimony) supporting the conclusion that USU ever signed any of them.

¶7     Several months later, in November 2013, President sent USU an email taking the position that USU's shares were in "limbo," and that "USU does not own the shares," because USU hadn't signed the Purchase Agreement. President asked USU to sign the agreements and indicated that GMW's lawyer (GMW Counsel) would be in touch with a "certified letter" that would contain a deadline by which USU would need to sign the agreements, and that if USU did not sign them by that date USU's ownership of the shares would "be cancelled."

¶8     GMW Counsel never sent any certified demand letter. Instead, he had two separate telephone conversations with one of USU's attorneys (USU Counsel) to discuss the matter. The first conversation occurred on November 12 or 13, 2013, and GMW Counsel memorialized his recollection of that call in an email—sent on November 13—to President. In that email, GMW Counsel indicated that, during this first telephone conversation, USU Counsel expressed specific concerns only about the Purchase Agreement, explaining that USU was not able to obtain shares by purchase "except in consideration for a license grant, so the only way it could take the shares from GMW was by donation."

¶9     A few days later, on November 18, GMW Counsel and USU Counsel had a second telephone conversation to discuss the unsigned agreements. The record does not contain any contemporaneously drafted emails describing this conversation. But USU Counsel, at a deposition in 2020, testified that, in this second conversation, he told GMW Counsel that the proposed

agreements "wouldn't work" for USU because they "did not reflect the expectations of the parties," and that USU "rejected" all of them, including the Shareholder Agreement.[1]

¶10    The day after the second phone call, USU Counsel returned the documents, unsigned, to GMW Counsel. About a week later, GMW Counsel sent USU a different document that "GMW propose[d] be executed in connection with the stock issuance transaction." That document, entitled "Joinder Agreement," purported to "ensure" that the shares USU received would be "entitled to the same rights and subject to the same restrictions as those applicable to other shares" of GMW stock. USU maintains that it never signed the Joinder Agreement either; GMW takes issue with this contention, but no signed copy appears in the record, and GMW has been unable to produce any other evidence that USU ever signed it.

¶11    In the months that followed, GMW appeared quite aware that USU had never signed any of the agreements in the Shareholder Book, including the Shareholder Agreement. In an email in May 2014, President complained to another GMW officer that, in his view, USU "read the Shareholder Agreement very thoroughly and decided early on they would not sign it." And just weeks later, one of GMW's outside attorneys sent a letter to a USU attorney lamenting USU's "continuing refusal to sign [GMW's] Shareholder Agreement."

---

1. GMW Counsel—the only other participant in the second phone call—was never deposed and did not submit any affidavit or declaration, so the record submitted to us does not include his account of this second call. Moreover, in connection with the motion it filed (discussed below) pursuant to rule 56(d) of the Utah Rules of Civil Procedure, GMW did not list GMW Counsel as one of the witnesses it wanted to depose.

¶12    In August 2019, GMW initiated the present lawsuit against USU, asserting two causes of action: (1) breach of the Shareholder Agreement and (2) breach of the covenant of good faith and fair dealing. Specifically, GMW alleged that USU breached the Shareholder Agreement by partnering with a potential investor in GMW to compete with GMW, activity which it claims "essentially destroyed" GMW.[2]

¶13    Before answering the complaint, USU filed a motion to dismiss, asserting (among other things) that there existed no enforceable contract between the parties because it had never signed the Shareholder Agreement and any unsigned agreement would be barred by the statute of frauds. The motion was later mooted by GMW's filing of an amended complaint, in which GMW set forth with additional particularity its claims that USU had—with or without signature—assented to the terms of the Shareholder Agreement.

¶14    After resolution of the motion to dismiss, USU answered the complaint, and the district court set certain scheduling deadlines, including a December 24, 2020 deadline for the completion of fact discovery. During that discovery period, the parties exchanged initial disclosures, engaged in written discovery (including the production of voluminous documents), and scheduled and took several depositions, including a deposition of USU Counsel.

¶15    On December 17, 2020, seven days prior to the close of fact discovery, the parties filed a stipulated motion to stay all

2. A more fulsome description of the activity GMW references in its complaint can be found in reported opinions in a related case. *See generally GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183 (10th Cir. 2022); *see also GeoMetWatch Corp. v. Utah State Univ. Rsch. Found.*, 2018 UT 50, 428 P.3d 1064 (answering certified questions in the federal lawsuit).

scheduling deadlines, noting USU's intent to file a motion for summary judgment which, "if granted, would obviate the need for any additional discovery." On December 21, the court signed an order staying all deadlines in the case pending its ruling on USU's expected motion.

¶16   As expected, USU then filed a motion for summary judgment, arguing that, although it was a GMW shareholder, it had never signed the Shareholder Agreement and had never otherwise assented to its specific terms. USU further argued that, even if it had somehow assented to those terms through some means other than signing the agreement, Utah's statute of frauds would bar enforcement of them because those terms—in particular the two-year non-competition and non-solicitation commitments—were incapable of being performed within one year. GMW opposed the motion on its merits, asserting that there was at least a fact question about whether USU agreed to be bound by the terms of the Shareholder Agreement, and that the statute of frauds was no bar to enforcement of those terms. In addition, GMW made a request, pursuant to rule 56(d) of the Utah Rules of Civil Procedure, asking the court to defer any ruling on USU's motion until after GMW had more time to conduct additional discovery. GMW identified two depositions it wanted to take: a rule 30(b)(6) corporate deposition of USU and a deposition of a witness whose name had come up in a deposition conducted in early November 2020. And GMW stated its intent to make additional "targeted written discovery requests to USU concerning its intent to be bound by the Shareholder Agreement." The district court conducted a hearing on both motions and, after the hearing, took the matter under advisement.

¶17   A few weeks later, the court issued a written decision granting USU's summary judgment motion and denying GMW's request for additional discovery. The court determined that GMW had failed to present any "documentation showing any assent to the [Shareholder Agreement] on the part of" USU, and therefore

concluded that no genuine issue of material fact remained to be decided on that question. The court further determined that the statute of frauds provided an additional ground for summary judgment because the key provisions at issue were not capable of being performed within one year. The court reasoned that GMW's second claim—for breach of the implied covenant of good faith and fair dealing—was also subject to dismissal because it was dependent upon the existence of an underlying agreement. And the court declined to give GMW more time to conduct additional discovery, noting that "the issues raised by [USU's] summary judgment motion should [have] come as no surprise" to GMW, especially given the content of USU's earlier motion to dismiss and the associated litigation regarding amendment of the complaint; the court concluded that GMW therefore "had plenty of time to engage in the discovery it now seeks to engage in" and "was not conscientious in pursuing additional discovery in this case as such could have been completed well before now."

## ISSUES AND STANDARDS OF REVIEW

¶18 GMW now appeals, and it presents two issues for our review. First, it asserts that the district court erred in granting USU's motion for summary judgment. "We review the district court's summary judgment ruling for correctness and view all facts and reasonable inferences in favor of the nonmoving party." *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 28, 235 P.3d 749 (quotation simplified).

¶19 Second, GMW challenges the court's refusal to grant its request for more time to conduct additional discovery. We review a district court's denial of such a request only "for an abuse of discretion." *Robinson v. Jones Waldo Holbrook & McDonough, PC*, 2016 UT App 34, ¶ 10, 369 P.3d 119, *cert. denied*, 379 P.3d 1183 (Utah 2016).

ANALYSIS

I

¶20    First, GMW challenges the district court's grant of summary judgment in USU's favor. In particular, it challenges the court's conclusion that no genuine issue of material fact remained to be decided regarding whether USU agreed to the terms of the Shareholder Agreement.

¶21    Formation of a contract requires, among other things, "a manifestation of mutual assent." *Aquagen Int'l, Inc. v. Calrae Trust*, 972 P.2d 411, 413 (Utah 1998) (quotation simplified); *see also* Restatement (Second) of Contracts § 17 (1981) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."). A signature is perhaps the most common method by which a party can exhibit assent to the terms of a contract. *See Livingston v. Finco Holdings Corp.*, 2022 UT App 71, ¶ 16, 513 P.3d 94 ("The purpose of a signature is to demonstrate mutuality of assent." (quotation simplified)), *cert. denied*, 525 P.3d 1263 (Utah 2022); *see also, e.g.*, *Boswell v. Panera Bread Co.*, 879 F.3d 296, 305 (8th Cir. 2018) (stating that "signatures remain a common, though not exclusive, method of demonstrating agreement" to the terms of a contract (quotation simplified)). But it is not the only way: "It is fundamental contract law that the parties may become bound by the terms of a contract even though they did not sign the contract," and this occurs where the parties, through words or actions, "have otherwise indicated their acceptance of the contract, or led the other party to so believe that they have accepted the contract." *Livingston*, 2022 UT App 71, ¶ 16 (quotation simplified).

¶22    In this case, GMW asserts that genuine issues of material fact remain to be decided concerning both (a) whether USU actually signed the Shareholder Agreement and (b) whether, even in the absence of any signature, USU's actions manifested an

intent to be bound by the Shareholder Agreement. The district court concluded otherwise, and we agree on both counts.

A

¶23 First, there is no genuine issue of material fact regarding whether USU signed the Shareholder Agreement. No signed copy is to be found in the record submitted to us. And GMW has not located any witness who can testify that anyone affiliated with USU actually signed the Shareholder Agreement. Indeed, to the contrary, the evidence that does exist in the record indicates that USU did not sign the Shareholder Agreement and that GMW was, at all relevant times, fully aware of that fact. GMW has produced no evidence refuting USU's position on this point.

¶24 "[T]he extent of the moving party's burden" in connection with a summary judgment motion "varies depending on who bears the burden of persuasion at trial." *Salo v. Tyler*, 2018 UT 7, ¶ 26, 417 P.3d 581. "A movant who seeks summary judgment on a claim on which it will bear the burden of persuasion at trial cannot seek summary judgment without producing affirmative evidence in support of the essential elements of its claim." *Id.* "But a movant who seeks summary judgment on a claim on which the *nonmoving* party bears the burden of persuasion may show that there is no genuine issue of material fact without producing its own evidence." *Id.* (emphasis added); *see also Orvis v. Johnson*, 2008 UT 2, ¶ 18, 177 P.3d 600 (stating that "where the nonmoving party will bear the burden of proof at trial," a movant "may satisfy its burden on summary judgment" simply by demonstrating a lack of evidence supporting the movant's position, and at that point "the burden then shifts to the *nonmoving* party" to "set forth specific facts showing that there is a genuine issue for trial" (quotation simplified)).

¶25 Here, GMW bears the ultimate burden of persuasion, at trial, on its claim for breach of contract. In this situation, USU—as

the summary judgment movant—may satisfy its burden by demonstrating that there exists no evidence supporting GMW's claim that USU signed the Shareholder Agreement. USU has discharged that burden here, and thus the burden shifts to GMW to identify evidence that supports its position. It cannot identify any direct evidence that USU ever signed the Shareholder Agreement, but it maintains that a factfinder could nevertheless reasonably infer that USU did indeed sign.

¶26　It is certainly true that, during the summary judgment process, "all *reasonable* inferences" must be drawn in favor of the nonmoving party. *See IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 19, 196 P.3d 588. And it is also true that "circumstantial evidence may sometimes raise an inference strong enough to create a genuine issue of material fact on summary judgment." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 21, 390 P.3d 314. But in order to be considered "reasonable," inferences—including, and perhaps especially, those based on circumstantial evidence—"must present something more than pure speculation." *Id.* And while "the line separating 'speculation' from 'reasonable inference' can at times be faint," *State v. Prisbrey*, 2020 UT App 172, ¶ 23, 479 P.3d 1126, *cert. denied*, 485 P.3d 946 (Utah 2021), courts have explained that "a reasonable inference exists when there is at least a foundation in the evidence upon which the ultimate conclusion is based, while in the case of speculation, there is no underlying evidence to support the conclusion," *Heslop*, 2017 UT 5, ¶ 22 (quotation simplified).

¶27　In this case, there is no direct evidence to support a conclusion that USU signed the Shareholder Agreement. And as discussed more fully below, the only circumstantial evidence to which GMW cites—and it does so more to support its contention of non-signatory assent than to support its contention that USU actually signed the agreement—is evidence indicating that USU considered itself a shareholder of GMW. But such evidence does nothing at all to support the notion that a USU official actually put

pen to paper on the Shareholder Agreement. It would be entirely speculative to infer, merely from USU's position that it considered itself a shareholder of GMW, that USU—despite its denials and the utter lack of evidence to contradict them—actually signed the Shareholder Agreement.

¶28   Thus, on this record, no reasonable factfinder could conclude that a USU official with authority to do so actually executed the Shareholder Agreement. Accordingly, we discern no error in the district court's conclusion that no genuine issue of material fact remains to be decided on the question of whether USU actually signed the Shareholder Agreement.

B

¶29   Despite the absence of USU's signature on the Shareholder Agreement, GMW maintains that USU—by its words and actions—nevertheless exhibited assent to the agreement's terms, and it contends that there is at least a genuine issue of material fact remaining to be decided on this point. In support of this contention, it points to six pieces of circumstantial evidence:

(1) USU asked GMW to issue USU a stock certificate for the GMW shares that had been earmarked for USURF;

(2) USU received from GMW a copy of the Shareholder Agreement signed by GMW;

(3) USU asked that one of its representatives be named to GMW's board of directors;

(4) USU asked to exercise its right, as a shareholder of GMW, to inspect GMW's books and records;

> (5) USU held itself out to third parties as a shareholder of GMW; and
>
> (6) USU "[n]ever explicitly reject[ed]" the Shareholder Agreement.

GMW asserts that a factfinder could reasonably infer, from this evidence, that USU—despite not signing the Shareholder Agreement—agreed to be bound by its terms. The district court disagreed, and so do we, because any such inference is insufficiently supported by the evidence and would be unduly speculative.

¶30    The second item in the list—that USU received a copy of the Shareholder Agreement from GMW that was signed by GMW[3]—does nothing to support GMW's contention that USU

---

3. In its phrasing of this second item of asserted circumstantial evidence, GMW somewhat ambiguously states that USU "never return[ed]" the copy of the Shareholder Agreement that it received from GMW. This statement is either untrue, or is of no assistance to GMW. If GMW intends to indicate that USU did not return the *unsigned* copy to GMW, that statement is contradicted by the record; USU Counsel testified—without contradiction and corroborated by a contemporaneous email—that he returned the documents, unsigned, to GMW Counsel. If GMW intends to indicate that USU did not return to GMW a copy of the agreement that USU had executed, USU would presumably agree with that statement; USU's position is that it never signed the agreement and therefore did not ever return a signed one to GMW. But that statement doesn't assist GMW at all; the fact that USU did not return to GMW a copy signed by USU does nothing to support GMW's position that USU agreed to be bound by the terms of the agreement. For purposes of our analysis, then, we construe the second item in the list as simply asserting that USU received the

(continued…)

assented to the agreement's terms. Receipt of the document simply indicates that USU received GMW's offer; it has nothing at all to say about whether USU accepted that offer. That item therefore does not support GMW's contention.

¶31 Four of the items in this list (the first, third, fourth, and fifth) are undisputedly true, but—on this record—they support only the notion that USU was a shareholder of GMW, not that USU agreed to be bound by the specific terms of the Shareholder Agreement. The chronology of how USU became a GMW shareholder is crucially important here; if GMW had conditioned USU's stock ownership on USU signing the Shareholder Agreement, a factfinder would likely be able to draw a reasonable inference that USU's acceptance of those shares indicated assent to the terms of the Shareholder Agreement. *See Commercial Union Assocs. v. Clayton*, 863 P.2d 29, 36–37 (Utah Ct. App. 1993) (holding that, where the parties mistakenly believed that a lessee had signed a contract, and where the lessee "acted in every respect as if it were under contract," the district court's finding that the lessee "manifested its intent to be bound" by the terms of the contract, despite never signing it, was not clearly erroneous). But that is not how the situation unfolded in this case.

¶32 USU asked GMW to issue it a stock certificate in January 2013. The next month, in February, GMW delivered the requested stock certificate to USU; that certificate was unrestricted and proclaimed USU to be the owner of 666,667 shares of GMW stock. GMW sent a cover letter with the certificate but did not in that letter ask USU to sign any shareholder agreement, and it did not attempt to condition USU's shareholder status on anything. When USU took receipt of that stock certificate in February 2013, it was by that point a full-fledged shareholder of GMW, with every right

---

Shareholder Book which contained a copy of the Shareholder Agreement that had been signed by GMW.

to seek representation on GMW's board of directors and to inspect the company's books and records.

¶33   It wasn't until April 2013—about two months later—that GMW asked USU to agree to the specific terms of the Shareholder Agreement. At that point, USU was already a shareholder of GMW, with full rights and privileges. It did not need to sign the Shareholder Agreement to become a shareholder of GMW, because it already was one. And given this chronology, evidence that USU considered itself a shareholder of GMW does not support the completely separate notion that USU somehow assented to the specific terms of the Shareholder Agreement.

¶34   Finally, the sixth item in GMW's list of evidence does not aid GMW. There, GMW asserts that USU "never explicitly reject[ed] the Shareholder Agreement." Presumably, this is a reference to GMW Counsel's email summary of the first November 2013 phone conversation between GMW Counsel and USU Counsel; according to that summary, USU Counsel expressed reservations only with the Purchase Agreement, and not specifically with the Shareholder Agreement. We assume, for purposes of our analysis, that GMW Counsel's email summary is correct, and that USU Counsel, in that first November phone call, did not specifically reject the Shareholder Agreement.

¶35   But the evidence is undisputed that USU Counsel *did* specifically reject the Shareholder Agreement in the *second* November 2013 phone call, the one that occurred on November 18. At a deposition, USU Counsel testified that, during that second call, he told GMW Counsel that the proposed agreements "wouldn't work" for USU because they "did not reflect the expectations of the parties," and that USU "rejected" all of them, including the Shareholder Agreement. USU Counsel's account of

this second conversation stands unrebutted in the record.[4] Thus, GMW's sixth item of evidence—that USU never expressly rejected the Shareholder Agreement—is not supported by the record: the undisputed evidence indicates that USU *did* reject the Shareholder Agreement, but it did so in the *second* call, if not in the first.

¶36   Still, GMW continues to assert, even in the face of this paucity of evidence, that a factfinder could reasonably draw an inference that USU agreed to be bound by the specific terms of the Shareholder Agreement. In support of this contention, GMW directs our attention to *AKB Properties LLC v. Rubberball Productions LLC*, 2021 UT App 48, 487 P.3d 465, *cert. denied*, 496 P.3d 713 (Utah 2021). In that case, we reversed a district court's grant of summary judgment on the basis that available

---

4. At times in its briefing, GMW complains about USU Counsel's invocation, at several points during his deposition, of attorney-client privilege, and about his refusal to answer certain questions on that basis. GMW even asserts that the district court should have inferred, from USU Counsel's invocation of privilege regarding certain questions about the Shareholder Agreement, that USU signed the Shareholder Agreement or otherwise assented to its terms. But there is no indication in the record that GMW attempted to litigate, in the district court, whether USU Counsel's invocation of the privilege was proper. And if it *was* proper, then no negative inference can fairly be drawn from it. *See In re Tudor Assocs., Ltd., II*, 20 F.3d 115, 120 (4th Cir. 1994) ("A negative inference should not be drawn from the proper invocation of the attorney-client privilege."). Thus, any argument GMW might make about invocation of the privilege was not preserved for our review, and we therefore decline to address it. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 ("When a party fails to raise and argue an issue in the [district] court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation.").

circumstantial evidence was sufficient "to cast doubt on the veracity of" sworn declarations provided by the moving party. *Id.* ¶ 21. At issue in the case was whether the parties to a written agreement had, during a "brief" and "casual" subsequent meeting, agreed to a significant oral modification of that agreement. *Id.* ¶¶ 7, 23. Two of the three participants in that meeting submitted declarations attesting that the modification had been made. *Id.* ¶ 9. The only other participant in the meeting had passed away; there was therefore no living witness who could contradict the other participants' declarations. *Id.* ¶ 20. One side moved for summary judgment, asserting that—because the two declarations were unrebutted—no genuine issue of fact remained to be decided regarding the existence of the oral modification. *Id.* ¶¶ 8–9. The other side—a company controlled by the deceased person's heirs—asserted that questions of fact remained because their witness was deceased and because other circumstantial evidence existed in the record supporting the notion that no oral modification had been effected. *Id.* ¶¶ 1, 12.

¶37     The district court entered summary judgment in the movant's favor, *id.* ¶ 11, but we reversed, noting the importance of the fact that the only witness who could controvert the declarations was deceased, and concluding that "there was more than enough circumstantial evidence [in the record] to cast doubt on the veracity of those declarations," *id.* ¶¶ 20–25. Specifically, we noted that, given the nature of the modification, a factfinder "could reasonably infer that the matter was of importance to the [parties] and that any modification would have occurred in writing." *Id.* ¶ 23. We noted that the modification may have lacked consideration. *Id.* ¶ 24. And we noted that the factfinder could take into account certain conduct by the parties, occurring after the alleged modification, that appeared to cut against the notion that the modification had occurred. *Id.* ¶ 25. In light of these items of circumstantial evidence, we concluded that there existed sufficient evidence from which a factfinder could disbelieve the

two declarations and reasonably infer that no oral modification had taken place. *Id.* ¶ 26. In so doing, however, we were careful to point out that "[t]he circumstances of this case are distinct from a situation in which living witnesses exist who might be able to refute [a] movant's evidence but the nonmovant has not bothered to seek their input." *Id.* ¶ 20 n.4.

¶38 In our view, *AKB Properties* is materially distinguishable from the case at hand, for two reasons. First, in this case there exists no problem with the availability of witnesses: there is no indication that any relevant witness has passed away or is otherwise unavailable. GMW was at all times free to contact and depose witnesses, affiliated with both USU and GMW, who might have had information about whether USU assented to the Shareholder Agreement.[5] Second, the circumstantial evidence available in *AKB Properties* was more extensive than similar evidence here. In *AKB Properties*, there existed several items of circumstantial evidence that suggested there had been no oral modification to the original written agreement. Here, by contrast, all the circumstantial evidence to which GMW points indicates only that USU was a shareholder and—given the chronology of events—does not support the separate notion that USU agreed to be bound by the specific terms of the Shareholder Agreement.

¶39 Under the circumstances presented here, even viewing the evidence and all reasonable inferences in favor of GMW, there is no genuine issue of material fact remaining to be decided regarding whether USU assented to the terms of the Shareholder Agreement. On this record, no reasonable factfinder could conclude that USU assented to those specific terms; any inference a factfinder might draw to support such a conclusion would be

---

5. In this vein, we note that GMW did not depose its own previous attorney, GMW Counsel, who could have provided his account of the second November 2013 phone call.

unduly speculative. Accordingly, the district court did not err in entering summary judgment in favor of USU on these issues.[6]

II

¶40 Second, GMW challenges the district court's denial of its request for more time to conduct additional discovery. We discern no abuse of discretion in the court's decision.

¶41 Under our rules, if the nonmoving party believes that it "cannot present facts essential to justify its opposition" to a motion for summary judgment, it may ask the court to "defer considering the motion or deny it without prejudice" in order to allow it additional time "to obtain affidavits or declarations or to take discovery." *See* Utah R. Civ. P. 56(d). As noted, in this context district courts enjoy wide discretion in their consideration of requests for additional time to conduct discovery, and we review a court's decision in this regard for an abuse of that discretion, reversing only in cases in which the decision "exceeds the limits of reasonability." *See Campbell, Maack & Sessions v. Debry*, 2001 UT App 397, ¶ 6, 38 P.3d 984 (quotation simplified); *see also Robinson v. Jones Waldo Holbrook & McDonough, PC*, 2016 UT App 34, ¶ 10, 369 P.3d 119, *cert. denied*, 379 P.3d 1183 (Utah 2016).

¶42 In considering a request under rule 56(d), courts are to consider "the specific circumstances of each case." *See Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 21, 192 P.3d 858. In particular, courts should examine the requesting party's rule 56(d) affidavit or declaration, and assess "whether the discovery sought will uncover disputed material facts that will prevent the grant of summary judgment" or whether the requesting party "is simply on a fishing expedition." *Id.*

---

6. In light of this conclusion, we need not reach GMW's other contention that the district court erred in its application of the statute of frauds.

(quotation simplified). Courts should also examine whether the requesting party "has had adequate time to conduct discovery and has been conscientious in pursuing such discovery." *Id.* And courts may take into account whether the party moving for summary judgment has been diligent "in responding to the discovery requests" lodged by the requesting party. *Id.*

¶43 In this case, the district court grounded its refusal to grant GMW's request for more time largely on the second factor: the court noted that the fact discovery period was all but over, and that the discovery GMW requested could easily have been obtained earlier, during the discovery period. It noted that "the issue of contract formation has been the crux of this case since its inception," and that those issues were not only the subject of USU's current summary judgment motion but had also been the subject of its earlier motion to dismiss. Given that USU's motion was not filed until after the fact discovery period was all but finished, the court concluded that GMW "had plenty of time to engage in the discovery it now seeks to engage in" and that GMW "was not conscientious in pursuing" that discovery during the fact discovery period. We discern no infirmity in the district court's reasoning.

¶44 In its rule 56(d) declaration, GMW identified only three specific items of additional discovery it wished to obtain: (1) a corporate deposition of USU, taken pursuant to rule 30(b)(6) of the Utah Rules of Civil Procedure, in which it could "get additional information regarding contract formation"; (2) a deposition of a witness whose identity GMW asserted it had discovered while taking another deposition in early November 2020, which witness GMW believed had additional information "concerning USU's ownership of the shares" and "concerning the terms and conditions of USU's ownership of those shares"; and (3) "targeted written discovery requests to USU concerning its intent to be bound by the Shareholder Agreement."

¶45 With regard to the first and third items, the district court's reasoning is clearly sound. From the outset of the case, it was quite clear—from, among other things, USU's initial motion to dismiss—that USU would defend the case chiefly on the basis that it had not agreed to the terms of the Shareholder Agreement. Under these circumstances, some of the most obvious things GMW might have wanted to do during the fact discovery period would have been to send USU written discovery requests on this topic and to conduct a corporate deposition of USU. GMW had every opportunity, during the entirety of the fact discovery period, to undertake this discovery. It did not, and it offers no persuasive explanation for its decision not to do so.

¶46 The question is somewhat closer with regard to the second item, because the identity of the witness in question apparently was not known to GMW until early November 2020. But even assuming that to be true, GMW still had some seven weeks remaining in the fact discovery period at that point, and it offers no reason why it could not have noticed up and taken this witness's deposition in that period of time. Under these circumstances, we cannot say that it was an abuse of the district court's discretion to conclude that GMW was not conscientious in using the available discovery period to take this deposition.

¶47 We note that this case differs, in one significant respect, from many other cases in which rule 56(d) requests are made: GMW's rule 56(d) request was not made until *after* the effective expiration of the fact discovery period. A requesting party who faces a motion for summary judgment filed early in the case, months before expiration of the fact discovery period, can often credibly argue that it has not yet had the chance to conduct discovery on the relevant topics. But a requesting party who has had the entire fact discovery period to conduct discovery on a topic it knew was relevant may find that argument much harder to credibly make. And that is the case here.

¶48 Given the posture of the case, a grant of GMW's rule 56(d) request would by definition have required a significant extension of the fact discovery cutoff date, as well as concomitant extensions of time for the deadlines to follow (e.g., expert discovery deadlines). It was well within the district court's discretion to take all of this into account, and to decline to grant GMW's request under the circumstances.[7]

## CONCLUSION

¶49 There is no genuine issue of material fact regarding whether USU signed the Shareholder Agreement or otherwise assented to its specific terms, and therefore the district court did not err in granting USU's motion for summary judgment on those points. Furthermore, it was reasonable for the court to deny GMW's request for additional discovery, and its denial of GMW's rule 56(d) request was therefore not an abuse of its discretion.

¶50 Affirmed.

---

7. Decisions regarding the management of a court's docket, "including whether to grant continuances or extend deadlines," are also reviewed for an abuse of discretion. *See Segota v. Young 180 Co.*, 2020 UT App 105, ¶ 9, 470 P.3d 479; *see also Solis v. Burningham Enters., Inc.*, 2015 UT App 11, ¶ 25, 342 P.3d 812 (acknowledging that district courts possess "broad discretion in managing the cases assigned to" them (quotation simplified)).